# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 8, 2015　　　Decided September 16, 2016

No. 11-1273

DIRECTV, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 11-1274, 11-1294

———

On Petitions for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

———

*Gavin S. Appleby* argued the cause for petitioner MasTec Advanced Technologies. With him on the briefs was *Michelle E. Shivers.*

*Jonathan C. Fritts* argued the cause for petitioner DIRECTV, LLC. With him on the briefs were *Charles I. Cohen* and *David R. Broderdorf.*

*Douglas E. Callahan*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the

brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Julie B. Broido*, Supervisory Attorney. *Kira D. Vol*, Attorney, entered an appearance.

*Matthew J. Ginsburg* argued the cause for *amicus curiae* American Federation of Labor and Congress of Industrial Organizations in support of respondent. With him on the brief were *Lynn K. Rhinehart* and *James B. Coppess*.

Before: ROGERS, BROWN and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

Dissenting opinion filed by *Circuit Judge* BROWN.

SRINIVASAN, *Circuit Judge*: The National Labor Relations Act protects employees' right to engage in concerted activities. That right encompasses protesting an employer's actions or policies through an appeal to the public for support. But while the Act protects employees' right to engage in such third-party appeals, the Act also recognizes the prerogative of employers to discharge employees "for cause." Those two principles can come into tension. That can happen, for instance, when employees publicly criticize their company in an attempt to draw support in an ongoing labor dispute, and the company then fires the employees for disloyalty.

The National Labor Relations Board bears responsibility for balancing the right of employees to engage in concerted activity against the right of employers to discharge disloyal workers. Under the Board's approach, an appeal to third parties in connection with an employment-related dispute can qualify as protected concerted activity even if the appeal is

disloyal and disparaging of the employer in some measure. But if the employees' appeal rises to the level of flagrant disloyalty, wholly incommensurate with any employment-related grievance, or if the employees make maliciously untrue statements about their employer, their conduct is no longer protected and their employer can discharge them for cause.

In this case, a group of employees, frustrated by a new pay policy at work and unable to make headway in direct discussions with their employer, aired their grievances publicly in an interview with a reporter for a local television news station. The company responded by firing the employees. The Board found that the company's termination of the employees was an unfair labor practice. In the Board's view, the employees' participation in the interview in furtherance of their employment-related grievances was protected concerted activity, and their statements were neither so disloyal nor so maliciously untrue as to fall outside the Act's protection. The Board therefore ordered the employees' reinstatement.

The employer, together with another company involved in the employees' termination, seeks review of the Board's decision. In the companies' view, the employees' statements in the television interview did not fall within the bounds of protected concerted activity because the statements were both maliciously untrue and flagrantly disloyal, wholly out of step with the employees' objections to the pay policy. The question for this court is not where we think the line between protected and unprotected activity should be drawn. Instead, we must determine whether the Board's finding that the employees' third-party appeal falls on the protected side of the line is in accordance with the law and supported by

substantial evidence. We answer those questions in the affirmative and thus enforce the Board's order.

I.

A.

This case involves two companies, DirecTV, which sells satellite television services to consumers, and MasTec, one of DirecTV's contractors. DirectTV relies on contractors such as MasTec to install satellite television receivers in subscribers' homes.

The events in question began to unfold in early 2006. At the time, DirecTV wanted each of its television receivers connected to a working (landline) phone line in customers' homes. A phone connection enabled customers to take advantage of certain features such as ordering pay-per-view movies using a remote control (without needing to make a phone call), downloading software upgrades, and viewing phone caller-ID on their television screens. A phone connection also benefitted DirecTV by allowing the company to track customers' viewing habits and thus to make more effective programming decisions.

In furtherance of DirecTV's aim to connect its receivers to a phone line, the company required its contractors to include connecting (and installing if necessary) a phone line as part of the standard receiver installation package, at no additional charge. DirecTV tracked the number of receivers each contractor successfully connected to phone lines.

In January 2006, MasTec's Orlando, Florida, office had the lowest connection rate of any DirecTV contractor nationwide. Concerned with MasTec's poor performance,

DirecTV took action: it began charging MasTec $5 for each receiver installed without a connection to a phone line, and it informed MasTec that it would continue to do so as long as MasTec's connection rate remained below 50%. MasTec passed along the monetary incentive to its installation technicians in the form of a new pay policy. First, technicians generally would be paid $2 less for each receiver they installed, but would receive an additional $3.35 if they connected the receiver to a phone line. Second, technicians who connected receivers to phone lines in fewer than half of their installations in a thirty-day period would be "back-charged" $5 for each unconnected receiver.

Although DirecTV wanted its receivers connected to phone lines, a phone connection was unnecessary for a receiver to work: it is undisputed that customers could receive the full range of television programming through a receiver regardless of any connection to a phone line. In the absence of a phone connection, however, DirecTV could not track customers' viewing preferences, and customers could not take advantage of the aforementioned features such as ordering pay-per-view movies through their remote control.

Still, many customers resisted making a phone connection. Some customers relied exclusively on cellular phone service and thus had no landline phone; others sought to maintain privacy by preventing DirecTV from knowing about their viewing preferences; and others wished to avoid giving their children ready access to pay-per-view movies. In addition, some customers disliked the sight of a phone cord running along the wall or across a room to connect the receiver to a phone line. For those customers, MasTec offered two premium installation options, under which, for an additional charge of roughly $50, there would be no visible cord.

Whatever the customers' reasons for resisting a phone connection, MasTec technicians—as evidenced by their low connection rate—struggled to connect receivers to phone lines. Perhaps unsurprisingly, then, the technicians strongly disfavored MasTec's new pay policy. In meetings with management, technicians complained about the fairness of the policy and the effect on their compensation.

Both MasTec and DirecTV responded to the technicians' concerns with advice for connecting more receivers. Some of the advice consisted of run-of-the-mill sales tactics such as persuading customers of the benefits of a phone connection. Some of the advice plainly was not meant to be taken literally, such as when a MasTec manager jokingly told technicians they should tell customers the DirecTV system would "blow up" without a phone connection.

But some of the advice was understood by technicians to suggest that they mislead or lie to customers about the necessity of a phone connection to receive television programming. For instance, the same MasTec manager who joked that technicians should tell customers the system would "blow up" without a phone connection also said that technicians should tell customers "whatever you have to tell them" and "whatever it takes" to gain approval to connect a phone line. MasTec supervisors also instructed technicians simply to connect a phone line without notifying customers. At least one supervisor said that technicians should advise customers that a receiver would not work without a phone connection. MasTec also showed technicians a video in which two DirecTV officials recommended telling customers that the phone line was a "mandatory part of the installation" and was "need[ed] . . . for the equipment to function correctly." *See MasTec Advanced Techs.*, 357 NLRB 103, 104 (2011); ALJ Op. 7-9 (J.A. 7-9); Training Video Tr. 2

7

(J.A. 431). The officials further suggested that technicians connect a phone line without telling the customer they were doing so.

In the face of that advice, technicians continued to voice their concerns and frustration. MasTec refused to change the pay policy. And neither company rescinded or modified its advice that technicians should do "whatever it takes" to make phone connections.

When the technicians received their first paychecks under the new pay policy, they revolted. They protested in the MasTec parking lot for two days, demanding more transparency and an end to the policy. In response, MasTec management offered to review the data affecting pay and to help technicians keep track of their connection rate during the month. But MasTec still refused to change the policy.

Getting nowhere with protests and direct talks with their employer, a group of MasTec technicians contacted a local television news station, which agreed to air a story. The technicians arrived at the station in their DirecTV vans and wearing DirecTV uniforms. A reporter from the station interviewed the technicians as a group. The station showed the resulting interview segment several times on the local news.

The segment addressed the technicians' grievances concerning the pay policy and their belief that they were being told to lie to customers; it also conveyed the reporter's understanding that the emphasis on a phone connection could ultimately cost customers money (in the form of the additional charge for a premium installation under which there would be no visible phone cord). The news story proceeded as follows (and, as edited by the news station,

contained statements from four technicians, reproduced in italics for demarcation).

> News Anchor: Yeah . . . technicians who have installed hundreds of DirecTV satellite systems across Central Florida . . . they're talking about a company policy that charges you for something you may not ever use. And as problem solver Nancy Alvarez found, if you don't pay for it, the workers do.
>
> Reporter Alvarez: They arrived at our Local 6 studios in droves. DirecTV trucks packed the parking lot and inside the technicians spoke their minds. (Accompanying video showed more than 16 DirecTV vans in the parking lot followed by a shot panning a group of technicians wearing shirts bearing the DirecTV logo.)
>
> (The scene shifts to a room where more than 20 technicians were seated, facing Alvarez.)
>
> Technician Lee Selby: *We're just asking to be treated fairly.*
>
> Alvarez: These men have installed hundreds of DirecTV systems in homes across Central Florida but now they admit they've lied to customers along the way.
>
> Technician Hugh Fowler: *If we don't lie to the customers, we get back charged for it. And you can't make money.*

Alvarez: We'll explain the lies later but first the truth. Phone lines are not necessary for a DirecTV system; having them only enhances the service allowing customers to order movies through a remote control instead of through the phone or over the internet.

Technician Frank Martinez: *It's more of a convenience than anything else. . . .*

Alvarez: But every phone line connected to a receiver means more money for DirecTV and MasTec, the contractor these men work for. So the techs say their supervisors have been putting pressure on them. Deducting five bucks from their paychecks for every DirecTV receiver that's not connected to a phone line.

Martinez: *We go to a home that . . . needs three . . . three receivers that's . . . fifteen dollars.*

Alvarez: Throw in dozens of homes every week and the losses are adding up fast.

Alvarez (questioning a room full of technicians): How many of you here by a show of hands have had $200 taken out of your paycheck? (Most technicians raise hands.)

Martinez: *More.*

Alvarez: Want to avoid a deduction on your paycheck? Well, according to this group, supervisors have ordered them to do or say whatever it takes.

Martinez: *Tell the customer whatever you have to tell them. Tell them if these phone lines are not connected the receiver will blow up.*

Alvarez: You've been told to tell customers that . . .

Martinez: *We've been told to say that. Whatever it takes to get that phone line into that receiver.*

Alvarez (reporting): The lie could cost customers big money . . . the fee to have a phone line installed could be as high as $52.00 per room . . . want a wireless phone jack? That will cost you another 50 bucks.

(Alvarez shown attempting unsuccessfully to obtain comment from MasTec at its offices.)

Alvarez (reporting): But statements from their corporate office and from DirecTV make it clear the policy of deducting money from employees' paychecks will continue. A DirecTV spokesman said techs who don't hook up phone lines are quote 'denying customers the full benefit and function of their DirecTV system.' These men disagree

and say the policy has done nothing but create an environment where lying to customers is part of the job.

Alvarez (interviewing): It's either lie or lose money.

Technician Sebastian Eriste: *We don't have a choice.*

Alvarez (reporting): Now . . . during our investigation, MasTec decided to reimburse money to some techs who had met a certain quota but the policy continues and one reason could be that DirecTV does keep track of their customers' viewing habits through those phone lines. Now just last year, DirecTV paid out a $5 million settlement with Florida and 21 other states for deceptive practices and now, because of our story, the attorney general's office is looking into this newest issue so we'll, of course, keep you posted.

News Anchor: You think they would have learned the first time.

Alvarez: You think so. We'll see what happens.

News Anchor: Thank you, Nancy.

*MasTec*, 357 NLRB at 104-06; Broadcast Tr. (J.A. 434-36). Neither Selby nor Martinez is one of the alleged subjects of

discrimination in this case, as both men resigned before the terminations at issue here.

When the segment aired, MasTec informed its contacts at DirecTV. DirecTV, in turn, told MasTec it did not want the technicians in the broadcast representing DirecTV in customers' homes. MasTec then fired nearly all of the technicians who participated in the broadcast, including those who did not speak on air.

B.

In an unfair labor practice proceeding against MasTec and DirecTV, the companies initially prevailed before an administrative law judge (ALJ). The ALJ first found that the technicians' appeal to the public through the news story related to an ongoing labor dispute with their employer, as was necessary for their conduct to qualify as protected concerted activity. The ALJ then turned to the "more difficult issue" of whether the technicians' statements in the segment nonetheless fell outside the Act's protection because they were "so disloyal, disparaging and malicious as to be unprotected." ALJ Op. 18 (J.A. 18). The ALJ concluded that the technicians' statements met that standard and thus were unprotected.

The Board disagreed with the ALJ. The Board explained that, under its decisions, "employee communications to third parties in an effort to obtain their support are protected where" (i) "the communication indicate[s] it is related to an ongoing dispute" and (ii) it "is not so disloyal, reckless or maliciously untrue as to lose the Act's protection." *MasTec*, 357 NLRB at 107. As to the first prong, the Board agreed with the ALJ "that the employee communications here were clearly related to their pay dispute." *Id.* As to the second

prong, the Board found that the ALJ "clearly erred in finding that the employee communications and/or participation in the Channel 6 newscast were either maliciously untrue or so disloyal and reckless as to warrant removal of the Act's protection." *Id.*

With regard to whether the technicians' statements were "maliciously untrue," the Board determined "that almost all of the statements . . . were truthful representations of what the [companies] told them to do," and any "arguable departures from the truth were no more than good-faith misstatements or incomplete statements, not malicious falsehoods." *Id.* at 107-08. With regard to whether the statements amounted to "unprotected disloyalty or reckless disparagement," the Board explained that "it will not find a public statement unprotected unless it is flagrantly disloyal, wholly incommensurate with any grievances which [the employees] might have." *Id.* (quoting *Five Star Transp., Inc.*, 349 NLRB 42, 45 (2007)). Here, the Board found, the technicians' statements did not meet that standard. As a result, the Board held that the companies had committed an unfair labor practice by firing the technicians for participating in the interview.

The companies filed petitions for review in this court, and the Board filed a cross-application for enforcement. *See* 29 U.S.C. § 160(e), (f). The Board also moved for summary enforcement of the portions of its order relating to issues that are unchallenged here—threats made by MasTec to its employees in violation of the Act and two of MasTec's workplace policies found to violate the Act. *See* Board Br. 27-28. Because MasTec brings no challenge to those portions of the order, we grant the Board's request for summary enforcement as to those issues. *See Allied Mech. Servs., Inc. v. NLRB*, 668 F.3d 758, 765 (D.C. Cir. 2012).

14

II.

This court "must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Tenneco Auto., Inc. v. NLRB*, 716 F.3d 640, 646-47 (D.C. Cir. 2013) (quoting *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011)). "Determining whether activity is concerted and protected within the meaning of Section 7 [of the Act] is a task that implicates the Board's expertise in labor relations," so the "Board's determination that an employee has engaged in protected concerted activity is entitled to considerable deference if it is reasonable." *Citizens Inv. Servs. Corp. v. NLRB*, 430 F.3d 1195, 1198 (D.C. Cir. 2005) (quoting *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 829 (1984)). Even "as to matters not requiring [the Board's] expertise," we may not "displace the Board's choice between two fairly conflicting views," regardless of whether we "would justifiably have made a different choice had the matter been before" us in the first instance. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

Applying those deferential standards here, we uphold the Board's decision. The Board held that the technicians' participation in the news segment was protected concerted activity relating to their ongoing dispute about the new pay policy. In the Board's view, the technicians' statements in the interview were neither so disloyal and incommensurate with their labor grievances, nor so maliciously untrue, as to fall outside the Act's protection. The companies do not dispute the correctness of the legal standards applied by the Board. They instead argue that the Board applied those standards in a manner contrary to law or reached conclusions unsupported

by substantial evidence. We conclude that the Board acted within its discretion.

A.

The National Labor Relations Act protects the right of employees to "engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. That protection encompasses efforts by employees "to improve terms and conditions of employment" through appeals to third parties standing "outside the immediate employee-employer relationship." *Eastex, Inc. v NLRB*, 437 U.S. 556, 565 (1978). For instance, this court has recognized the right of employees to support a consumer boycott of their employer's products in connection with a labor dispute (as long as they do not go beyond the dispute to disparage the employer's product itself). *George A. Hormel & Co. v. NLRB*, 962 F.2d 1061, 1064 (D.C. Cir. 1992). Employees may not be discharged for engaging in such protected conduct. *Id.*; *see* 29 U.S.C. § 158(a)(1).

While the Act protects the right of employees to engage in third-party appeals, the Act also establishes that an employer may not be required to reinstate an employee who has been "suspended or discharged for cause." 29 U.S.C. § 160(c). And "[t]here is no more elemental cause for discharge of an employee than disloyalty to his employer." *NLRB v. Local Union No. 1229, Int'l Bhd. of Elec. Workers*, 346 U.S. 464, 472 (1953) (*Jefferson Standard*).

Of course, some third-party appeals by employees, even in the context of a labor dispute, could fairly be considered disloyal. An "employee who supports a boycott of his employer's product," for instance, "violates his duty of loyalty to the employer." *Hormel*, 962 F.2d at 1064.

Nonetheless, we have held that an employee has a protected entitlement to support a boycott of his employer's product if it arises in connection with an ongoing employment dispute. *Id.* at 1065.

The Act therefore recognizes two potentially competing interests. On one hand, the Act gives an employee a protected right to engage in (and thus to avoid discharge for engaging in) third-party appeals in furtherance of an employment grievance, even if the employee's conduct amounts to disloyalty. On the other hand, the Act recognizes an employer's latitude to discharge an employee for cause, including for disloyalty. So where is the line between protected third-party appeals, for which employees are immune from discharge for disloyalty, and unprotected third-party appeals, for which employees are subject to discharge for disloyalty?

The Supreme Court's decision in *Jefferson Standard*, 346 U.S. 464, gives some guidance. The case arose out of a television station's contract dispute with its employees. The principal point of disagreement concerned the union's efforts to secure renewal of a contract provision subjecting employee discharges to arbitration. *Id.* at 467. Employees picketed outside the station's offices, displaying placards and distributing handbills criticizing the station for refusing to renew the arbitration provision. The employer took no exception to any of that conduct. *Id.* at 467.

About a month and a half into the dispute, however, a group of employees began distributing a new handbill. Unlike the original handbills, the new handbill "made no reference to the union, to a labor controversy or to collective bargaining." *Id.* at 468. It instead criticized the company's product and business policies in the form of "a vitriolic attack

on the quality of the company's television broadcasts." *Id.* The station terminated the technicians associated with the new handbill, and the Board sustained the company's action.

The Supreme Court upheld the Board's decision. The Court emphasized that the new handbill "related itself to no labor practice of the company," and "made no reference to wages, hours or working conditions." *Id.* at 476. "The attack asked for no public sympathy or support," and the "policies attacked were those of finance and public relations for which management, not technicians, must be responsible." *Id.* In those circumstances, the Court explained, the "fortuity of the coexistence of a labor dispute affords these technicians no substantial defense." *Id.* That was because the new handbill "omitted all reference to," and "had no discernible relation to," the ongoing labor controversy. *Id.* Rather, the handbill simply made "a sharp, public, disparaging attack upon the quality of the company's product and its business policies, in a manner reasonably calculated to harm the company's reputation and reduce its income." *Id.* at 471. In that context, the handbill amounted to "a demonstration of such detrimental disloyalty as to provide 'cause'" for the employees' discharge. *Id.* at 472.

In the years since *Jefferson Standard*, the Board has formulated a two-prong test for assessing whether employees' third-party appeals constitute protected concerted activity or instead amount to "such detrimental disloyalty" as to permit the employees' termination for cause. Under the Board's test, "employee communications to third parties in an effort to obtain their support are protected where [i] the communication indicate[s] it is related to an ongoing dispute between the employees and the employers and [ii] the communication is not so disloyal, reckless or maliciously untrue as to lose the Act's protection." *American Golf Corp.*,

330 NLRB 1238, 1240 (2000) (*Mountain Shadows Golf*); *see Emarco, Inc.*, 284 NLRB 832, 833 (1987). This court has upheld the *Mountain Shadows Golf* test as "accurately reflect[ing] the holding in *Jefferson Standard*." *Endicott Interconnect Technologies, Inc. v. NLRB*, 453 F.3d 532, 537 (D.C. Cir. 2006).

The first prong of the test—whether "the communication indicate[s] it is related to an ongoing dispute between the employees and the employers"—focuses on whether it would be apparent to the target audience that the communication arises out of an ongoing labor dispute. *Mountain Shadows Golf*, 330 NLRB at 1240. "[T]hird parties who receive appeals for support in a labor dispute will filter the information critically so long as they are aware it is generated out of that context." *Sierra Publ'g Co. v. NLRB*, 889 F.2d 210, 217 (9th Cir. 1989). In *Jefferson Standard*, the handbill in question fell outside the Act's protection because it simply attacked the quality of the company's product without indicating any connection to the ongoing labor controversy.

In this case, by contrast, there is no dispute that the technicians' statements in the interview segment indicated a relationship "to an ongoing dispute between the employees and the employers," satisfying the first prong of the *Mountain Shadows Golf* test. 330 NLRB at 1240. The companies thus do not challenge the Board's finding "that the employee communications here were clearly related to their pay dispute." *MasTec*, 357 NLRB at 107.

The issue in this case solely concerns the second prong of the *Mountain Shadows Golf* test: whether the employees' statements in the interview were "so disloyal, reckless or maliciously untrue as to lose the Act's protection." 330 NLRB at 1240. The second prong does independent work, in

that an employee's third-party appeal, to be protected, not only must relate to an ongoing labor dispute (the first prong) but also cannot be "so disloyal, reckless, or maliciously untrue" as to fall outside the Act's protections (the second prong). *Id.* *Jefferson Standard* had no occasion to address the latter issue because the employees' disparaging communication giving rise to their discharge in that case "omitted all reference to" the ongoing labor dispute—it thus failed at what would become the first step of the *Mountain Shadows Golf* test. 346 U.S. at 476.

Our dissenting colleague believes that *Jefferson Standard* in fact engaged with what would become the second step of that test because the Court, in the penultimate sentence of its opinion, said: "Even if the [employees'] attack were to be treated, as the Board has not treated it, as a concerted activity wholly or partly within the scope of those mentioned in § 7 [of the Act], the means used by the technicians in conducting the act have deprived the attackers of the protections of that section, when read in the light and context of the purpose of the Act." *Id.* at 477-78. We read that sentence to pertain to the first-step inquiry, not the second step. Specifically, the Court there confirmed that, even if the Board had found the employees' handbill to be protected activity connected to the ongoing labor dispute, the Court would have disagreed because the "means used by the technicians" in the handbill had omitted any reference to—and had made no purported connection to—that dispute (a fact emphasized by the Court throughout its opinion, *see id.* at 468, 472, 476-77). And because a third-party appeal must *indicate* a connection to an ongoing labor dispute in order to satisfy the first step (mere contemporaneousness with a dispute is not itself enough), *see Mountain Shadows*, 330 NLRB at 1240, the handbill in *Jefferson Standard* would have been deemed unprotected even if the Board had found otherwise. The handbill thus was

unprotected conduct for which the employees could be discharged, as had also been true of the unprotected activity in several cases referenced by the Court in a footnote appended to the above-quoted sentence. *See* 346 U.S. at 478 n.13.

In this case, unlike *Jefferson Standard*, the employees' third-party appeal indicated its connection to the ongoing labor dispute. We therefore must proceed to the second step to assess whether the employees' statements in the television segment were so disloyal or maliciously untrue as to relinquish the Act's protection.

## B.

The Board concluded that the employees' communications in the news segment were neither "so disloyal" nor so "maliciously untrue" as to fall outside the Act's protection. *See MasTec*, 357 NLRB at 107-08. The companies challenge the Board's decision both as to disloyalty and as to malicious untruth. We find no basis to overturn the Board on either score under the governing standards of review. (We note that, while the *Mountain Shadows Golf* test refers not only to "disloyal" or "maliciously untrue" statements but also to "reckless" statements, the Board considered the latter category in conjunction with disloyalty, *see id.* at 108, and neither company takes issue with the Board's approach in that respect.)

## 1.

We first consider the Board's conclusion that the technicians' statements in the interview segment were not "so disloyal . . . as to lose the Act's protection." *Id.* at 107. As we have explained, it is well-established that third-party

appeals can fall within the zone of protected activity even if indisputably disloyal. *See Hormel*, 962 F.2d at 1064-65. The question therefore is: when does an employee's participation in efforts to obtain third-party support become *so* disloyal that it ceases to fit within the Act's protection? And on the facts here, were the employees' statements in the interview about the new pay policy, and about the companies' urging them to mislead customers, so disloyal as to be unprotected?

Under the Board's decision, third-party appeals cross the line from protected to unprotected disloyalty when they become "flagrantly disloyal, wholly incommensurate with any grievances which [the employees] might have." *MasTec*, 357 NLRB at 108 (quoting *Five Star Transp., Inc.*, 349 NLRB at 45); *see also, e.g.*, *Manor Care of Easton, Pa.*, 356 NLRB No. 39 (Dec. 1, 2010); *Valley Hosp. Med. Ctr., Inc.*, 351 NLRB 1250, 1260 (2007); *Sacramento Union*, 291 NLRB 540, 546 (1988); *Richboro Cmty. Mental Health Council*, 242 NLRB 1267, 1268 (1979); *Veeder-Root Co.*, 237 NLRB 1175, 1177 (1978). Neither company contends that the "flagrantly disloyal"/"wholly incommensurate" standard applied by the Board in this case is improper or otherwise contrary to law.

Our dissenting colleague nonetheless takes issue with that formulation on the ground that "the NLRA doesn't immunize disloyal behavior" in a third-party appeal at all, regardless of the degree of disloyalty. Dissenting Op. 15. That is incorrect, and is inconsistent with our precedent. In *Jefferson Standard* itself, the Court spoke in terms, not of whether the employees' third-party appeal was disloyal, but instead of whether it exhibited "*such detrimental disloyalty* as to provide 'cause' for" dismissal. 346 U.S. at 472 (emphasis added). Accordingly, when we later applied *Jefferson Standard* in our decision in *Hormel*, we specifically rejected the employer's argument that the Act posed no obstacle to its discharge of an

employee for engaging in the disloyal conduct of supporting a boycott against the company. Although we deemed the employee's conduct in that regard to constitute disloyalty "[a]s a rule," we held that the Act still "protects [the employee] from discharge on that account" insofar as his actions "arose out of the ongoing labor dispute." *Hormel*, 962 F.2d at 1064-65. Under *Hormel*, that is, the Act *does* immunize disloyalty in a third-party appeal when it is related to an ongoing employment dispute.

Our court therefore subsequently accepted the Board's conclusion that, to afford valid grounds for discharge under *Jefferson Standard*, an employee's third-party appeal in connection with an ongoing labor dispute must be more than just disloyal: it must be "*so disloyal . . . as to lose the Act's protection.*" *Endicott*, 453 F.3d at 537 (emphasis added) (quotation omitted). And once we accept, as our precedent compels, that disloyalty alone is not enough to remove the Act's protections in the context of a third-party appeal, we see no facial invalidity in the Board's general description of the requisite nature and degree of disloyalty as "flagrant[] disloyal[ty], wholly incommensurate with any grievances which [the employee] might have." *MasTec*, 357 NLRB at 108 (quoting *Five Star Transp., Inc.*, 349 NLRB at 45). The Board of course might have used various formulations to capture a third-party appeal that is unprotected because it is disloyal to an extent going sufficiently beyond the seeking of public support in connection with an ongoing labor dispute. Asking whether a public appeal is "wholly incommensurate" with the ongoing grievance, and is "flagrantly disloyal" in that sense, is one such formulation. Petitioners evidently agree: neither company, as noted, challenges that formulation.

In finding that the technicians' conduct qualifies as a protected third-party appeal under that standard, the Board

explained that the technicians went to the television station "only after repeated unsuccessful attempts to resolve" their dispute through direct discussions with MasTec. *MasTec*, 357 NLRB at 108. The Board further noted that, although the "newscast shed unwelcome light" on the companies' business practices, the segment "directly related to the technicians' grievance about what they considered to be an unfair pay policy that they believed forced them to mislead customers" about the need for a phone connection to receive television programming. *Id.* In those respects, the technicians' conduct was not "wholly incommensurate with [their] grievances" about the pay policy and their being encouraged to mislead customers to avoid losing pay under that policy. *See id.*

The Board additionally observed that, while the technicians might have been aware that the newscast could lead some consumers to cancel their service, there was no evidence the technicians specifically "intended to inflict such harm on the" companies in their statements in the segment "or that they acted recklessly without regard for the financial consequences to" the companies (as opposed to an intent to garner public support for their own position in the ongoing pay dispute). *Id.* (citing *Community Hosp. of Roanoke Valley*, 220 NLRB 217, 223 (1975), *enf'd* 538 F.2d 607 (4th Cir. 1976); *NLRB v. Circle Bindery, Inc.*, 536 F.2d 447, 452 (1st Cir. 1976)). In that sense, the technicians' third-party appeal was no more disloyal (or more "flagrantly" so) than employees' efforts to obtain public support for a boycott of their company's products in an ongoing labor dispute, which, as noted, we held in *Hormel* is protected activity even though a breach of their duty of loyalty. *See* 962 F.2d at 1064-65.

The companies, joined by our dissenting colleague, see an inconsistency with *Hormel* in the Board's noting (as one consideration) the lack of evidence that the employees

participated in the newscast with the intention to cause subscribers to cancel their service rather than the intention to gain public support in the pay dispute. In *Hormel*, we addressed three episodes in which an employee sought public support for a national boycott of Hormel's products. *See id.* at 1062-63, 1065. The first two episodes occurred during, and in relation to, a labor dispute between the employee's union and the company. The Act thus "protect[ed] [the employee] from discharge on that account" even though the conduct constituted disloyalty. *Id.* at 1065. But the third episode took place after the labor dispute had ended. *See id.* at 1063, 1064. We found that support of a consumer boycott against one's own company at that point in time—"after the end of the labor dispute," *id.* at 1064—necessarily presents grounds for discharging the employee for disloyalty, because, by definition, it bears no relation to an ongoing labor dispute. The sole issue in *Hormel* with respect to the employee's *post*-dispute conduct therefore was whether he in fact "support[ed] the consumer boycott of Hormel products"—if he did, his actions "were not protected" and he could be "lawfully discharged" for disloyalty. *Id.*; *see id.* at 1065-66.

The companies' argument here focuses on our analysis of that issue in *Hormel*, i.e., whether the employee's post-dispute actions constituted support of the boycott, in which case it was unprotected disloyalty. The conduct in question consisted of driving a truck in a parade leading to a rally for the boycott and then attending the rally. *See id.* at 1063, 1065-66. The employee's actions, to any observer, would have appeared to constitute support of the boycott. The Board nonetheless concluded otherwise, on the rationale that, no matter how his actions may have appeared, the company failed to prove that he in fact intended to support the boycott. *See id.* at 1064-65. We explained that the Board erred in assessing the employee's support for the boycott based solely

on his actual intent (i.e., what he "believed in his heart of hearts"), rather than asking whether a "reasonable observer" would infer that the employee "acted in furtherance of the boycott." *Id.* at 1065-66. Here, the companies argue that the Board similarly erred by taking into account as one consideration whether the technicians, in participating in the newscast, "intended" to cause consumers to cancel their service. *MasTec*, 357 NLRB at 108.

The companies' argument is unpersuasive. The relevant discussion in *Hormel* addressed a different question than the one at issue here. In this case, the Board took note of whether the technicians intended to cause subscribers to cancel their service when assessing whether the technicians' participation in the news interview was "so disloyal" as to fall outside the Act's protection. In *Hormel*, by contrast, the discussion of employee intent pertained to the question of whether the employee had engaged in disloyal conduct in the first place— viz., whether he had acted in support of the boycott. In other words, the question in *Hormel* was, "did he do it?," whereas the question here is, assuming he did it, "does what he did rise to the level of flagrant disloyalty?" While *Hormel* bars any consideration of intent as to the former question, the decision does not address, and thus does not prohibit, the consideration of intent when assessing whether an employee's third-party appeal rises to the level of flagrant disloyalty.

Our dissenting colleague agrees that *Hormel* involved a different question, but believes that the difference is immaterial. *See* Dissenting Op. at 7-8. We disagree. *Hormel* establishes that an employee of course cannot disclaim an action that rings out as disloyal to all the world by contending that he in fact did not intend to act disloyally. The employee had "violated his duty of loyalty to Hormel" by "driving in the parade and attending the rally to which it led"—he

"clearly communicated to every observer that he was a member of the group supporting the boycott," regardless of whether the company showed what he "believed in his heart of hearts." *Hormel*, 962 F.2d at 1066. That is a meaningful limitation in circumstances like those in *Hormel*, in which the employee could not have been engaged in a protected third-party appeal because the labor dispute had already ended. As we explained, "extending protection to such conduct would so circumscribe as to defeat the employer's right to discharge an employee" for disloyalty. *Id.* at 1065. That understanding applies in any situation involving a discharge for disloyalty, not just in a third-party appeal to the public: whenever the ground for discharge is disloyalty, *Hormel* precludes insulating the employee from discharge on a theory that, however much it may appear that he engaged in disloyal conduct, he might not have intended to do so. Under *Hormel*, the appearance is enough to establish that the employee engaged in disloyal conduct.

The dissent believes that, although *Hormel* involved the question whether the employee engaged in disloyal conduct for which he could be discharged (because it was unconnected to any ongoing dispute), the decision's bar against considering employee intent as to that question necessarily also extends to the determination whether, when an employee's third-party appeal *is* connected to an ongoing dispute and thus may be protected, it is *so* disloyal as to lose the Act's protections. *Hormel* itself did not think it was reaching the latter issue: we said that the case "turn[e]d upon the question whether the Board properly determined that [the employee] did not support the consumer boycott of Hormel products after the end of the labor dispute," when his conduct by definition would be grounds for discharge if disloyal. *Id.* at 1064. To be sure, in answering that question, we observed that "the Act requires an objective test of disloyalty." *Id.* at

1065. But that statement must be read in context, not in an expansive manner reaching even questions not before the court. Indeed, our dissenting colleague allows that intent can continue to play at least some role in connection with disloyalty after *Hormel*. *See* Dissenting Op. 11 n.4. And when read in context, it is apparent that *Hormel*'s mandate for an "objective test" pertained to the question whether the employee had engaged in the disloyal act of supporting a boycott against his company, *see* 962 F.2d at 1064-65, in which event he could be discharged for unprotected disloyalty having no connection to an ongoing dispute.

The Board could reasonably conclude that, even if an employee's subjective intent cannot bear on that question under *Hormel*, an employee's intentions can still shed meaningful light on whether, when a third-party appeal *is* related to an ongoing grievance, it is protected—in particular, on whether the employee primarily aimed to draw the public's support in the dispute or instead intended to go further by gratuitously causing harm to the company (i.e., "wholly incommensurate" with the grievance). The Board thus could consider an actor's state of mind to bear on whether the degree and nature of his disloyalty warrants denying him the Act's protections even though his appeal relates to an ongoing grievance. *See Sierra Publ'g Co.*, 889 F.2d at 218-19 n.13 ("motive, if discernible, may illuminate loyalty or disloyalty"); *cf. Morisette v. United States*, 342 U.S. 246, 249 n.21 (1952) ("intent is of the very essence of [criminal] offenses based on disloyalty"). Here, accordingly, the Board permissibly considered whether the employees' statements in the news segment sought to draw public support for their grievance or instead aimed gratuitously to harm their employer by causing consumers to cancel services. *Hormel* does not bar consideration of an employee's motivations in

that fashion to assess if a third-party appeal connected to an ongoing dispute is so disloyal as to be unprotected.

The companies get no further in their reliance on our decision in *Endicott Interconnect Technologies, Inc. v. NLRB*, 453 F.3d 532.  There, an employee, in the aftermath of layoffs at his company, strongly criticized the company's management in statements to a reporter and in an internet posting.  *Id.* at 534-35.  He told the reporter that the layoffs left "gaping holes in th[e] business" and resulted in "voids in the [company's] critical knowledge base."  *Id.* at 534.  After the company warned him against making such statements, he nonetheless posted a message on a public internet forum saying, among other things:  "This business is being tanked by a group of people that have no good ability to manage it.  They will put it into the dirt just like the companies of the past . . . ."  *Id.* at 535.  The company fired him, but the Board found that he had engaged in protected activity and ordered his reinstatement.  *Id.*

Upon review, we set aside the Board's decision.  We noted that the Board had invoked its *Mountain Shadows Golf* test for identifying protected third-party appeals, and held that the test was an accurate statement of the law.  *Id.* at 537.  We explained, though, that while the test calls for assessing whether an employee's statements were "so disloyal, reckless, or maliciously untrue as to lose the Act's protection," the Board had disregarded the "disloyalty" aspect of the standard altogether, instead focusing exclusively on whether the statements were maliciously untrue or reckless.  *Id.* Examining the question of disloyalty in the first instance, we held that the employee's statements were so disloyal as to fall outside the Act's protection.  We emphasized that the offending statements had been made by an "experienced insider," and endangered the viability of the company at a

critical time when it "was struggling to get up and running under new management." *Id.*

Our decision in *Endicott* did not compel the Board in this case to conclude that the technicians' participation in the television interview amounted to flagrant disloyalty. *Endicott* of course did not establish that all conduct amounting to disloyalty automatically affords grounds for discharge: *Endicott* came after *Hormel*, in which we had already established that third-party appeals, even if amounting to disloyalty, can be protected concerted activity when connected to an ongoing labor dispute. *See id.* at 536 (citing *Hormel*).

The question of whether a third-party appeal is *so* disloyal as to fall outside the Act's protection is an inherently fact-intensive, context-dependent one. *See, e.g.*, *Sierra Pub. Co.*, 889 F.2d at 217; *see also Jefferson Standard*, 346 U.S. at 475-76. In concluding in *Endicott* that the employee's statements crossed the line from protected to unprotected disloyalty, we thus focused on case-specific considerations such as the employee's status as an experienced insider, the particular vulnerability of the company as it was coming under new management, and the "caustic[]" nature of the employee's attacks claiming that the new management would "tank[]" the company and "put it into the dirt." 453 F.3d at 537. This case involves differently situated employees and companies. It also involves different types of statements, in that the technicians made no assertions about management decisions or management's running of the company outside the specific context of their grievances about the pay policy.

Significantly, moreover, we decided *Endicott* in circumstances in which the Board had failed to apply the "disloyalty" aspect of the *Mountain Shadows Golf* test

altogether. *See id.* Considering the issue in a vacuum, we concluded that the employee's statements rose to the level of unprotected disloyalty. Here, by contrast, the Board specifically examined the question of disloyalty on the facts of this case, concluding that the technicians' statements were not so disloyal as to lose the Act's protection. In that setting, we do not reexamine the issue as if we were deciding it on a blank slate. Rather, we assess only whether there is "substantial evidence in the record to support the Board's conclusion." *Hormel*, 962 F.2d at 1066.

Substantial evidence supports the Board's determination that the technicians' statements in the news segment were not "flagrantly disloyal, wholly incommensurate" with their grievances against the pay policy. Neither of the companies argues otherwise. To prevail in any such argument, the companies would need to demonstrate that no reasonable mind could find the evidence adequate to support the Board's finding. *Universal Camera*, 340 U.S. at 477. They could not do so on the record before the Board.

The Board explained that: the technicians participated in the newscast only after unsuccessfully attempting to resolve their grievance directly with their employer; the news segment directly related to their objections to a pay policy viewed by them to be unfair and to call for them to mislead customers; and their statements sought to bring attention to the nature of their grievances rather than to unnecessarily tarnish their employer. *MasTec*, 357 NLRB at 108. In those circumstances, it was reasonable for the Board to conclude that the technicians' statements in the interview were not "flagrantly disloyal, wholly incommensurate with any grievances which they might have." *Id.*

2.

We turn next to the Board's finding that the technicians' statements in the interview were not "maliciously untrue." For a third-party appeal to fall outside the Act's protection on grounds of malicious untruth, it is not enough for employee statements to be false, inaccurate, or misleading. Such statements may be "untrue," but they would not be "maliciously untrue." For statements to be "maliciously untrue and unprotected," they must be "made with knowledge of their falsity or with reckless disregard for their truth or falsity." *MasTec*, 357 NLRB at 107 (citing *TNT Logistics North America, Inc.*, 347 NLRB 568, 569 (2006), *rev'd. sub nom. Jolliff v. NLRB*, 513 F.3d 600 (6th Cir. 2008)); *see Sprint/United Mgmt. Co.*, 339 NLRB 1012, 1018 (2003); *Senior Citizens Coordinating Council of Riverbay Cmty. Inc.*, 330 NLRB 1100, 1107 n.17 (2000); *Delta Health Ctr., Inc.*, 310 NLRB 26, 36 (1993); *see also Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 64-65 (1966) (adopting actual malice standard from *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964) for libel actions under state law arising out of labor disputes). And while our dissenting colleague questions whether the malicious-untruth inquiry should have any independent office, *see* Dissenting Op. 23-24, our decision in *Endicott* validated the Board's standard under which it examines whether a communication is "maliciously untrue" so "as to lose the Act's protection." 453 F.3d at 537. We have no occasion to revisit the matter here.

The companies do not challenge the Board's legal understanding of the malicious-untruth standard. Instead, they argue that certain statements in the news segment rose to the level of malicious untruth, and that the Board erred in finding otherwise. We review those arguments under the substantial evidence standard. We ask, that is, whether the

Board could reasonably find the evidence adequate to support its conclusion that the technicians' statements were not maliciously untrue. *See Universal Camera*, 340 U.S. at 477. Moreover, when applying the substantial evidence standard to the Board's decisions about protected versus unprotected conduct, we give "considerable deference" to the Board's "reasonable" conclusions because of the Board's particular expertise in the area. *Citizens Inv. Servs.*, 430 F.3d at 1198.

The Board concluded that, "for the most part," the technicians' statements in the news segment "were accurate representations of what [the companies] had instructed the technicians to tell customers" about the need to connect a phone line for the receiver to work. *MasTec*, 357 NLRB at 107. "Any arguable departures from the truth," the Board found, "were no more than good-faith misstatements or incomplete statements, not malicious falsehoods justifying removal of the Act's protection." *Id.* at 108. We hold that the Board could reasonably consider the evidence adequate to support its findings.

a.

The first statements at issue are those in which the technicians said that they were told to lie to customers about the need for a phone connection and that their pay would be reduced if they did not lie. In particular, one technician observed, "If we don't lie to the customers, we get back charged for it"; and another said, "We don't have a choice," after the reporter remarked, "It's either lie or lose money." *MasTec*, 357 NLRB at 105-06.

The companies argue that the Board improperly disregarded the ALJ's finding that the employees were "never explicitly told to lie." ALJ Op. 19 (J.A. 19). In fact, the

Board agreed that the technicians were not *explicitly* told to lie; it simply found that they were "*essentially* told to lie." *MasTec*, 357 NLRB at 107 (emphasis added). Substantial evidence supports the Board's conclusion. For instance, in a DirecTV training video—which the ALJ, Board, and this court all had the same opportunity to review—two DirecTV Vice Presidents advised the technicians to tell customers (falsely) that connecting a phone line "is a mandatory part of the installation and [needed] for the equipment to function correctly." Training Video Tr. 2 (J.A. 431). Neither company claims that statement was true.

Additionally, the Board explained, even if the companies "may have avoided expressly using the word 'lie' when suggesting ways to overcome obstacles to making receiver-phone line connections," the technicians were instructed to do "'whatever it takes' to make the connection" and to "tell customers 'whatever you have to tell them.'" *MasTec*, 357 NLRB at 107. In the Board's view, the "technicians would readily understand these instructions to include 'lie if you have to.'" *Id.* That is at least a reasonable conclusion to draw from the evidence. As a result, substantial evidence supports the Board's conclusion that there was no malicious untruth in the technicians' statements that they were told to lie.

Even so, the companies argue, it was maliciously untruthful for the technicians to say that they would lose money if they did not lie. The companies do not dispute that technicians were subject to a back-charge of $5 for each receiver they did not connect to a phone line. The companies see a malicious untruth, though, in the lack of specificity in the interview segment that the per-receiver back-charge applied only if a technician failed to connect at least half of his receivers to a phone line over a 30-day period.

Substantial evidence supports the Board's conclusion that the absence of a fully elaborated explanation of the pay policy was not so maliciously untruthful as to lose the Act's protection. As an initial matter, the technicians had little, if any, control over the editing of their interview or the content of the final segment. *See id.* at 107 n.12. At any rate, as the Board observed, the technicians' statements in the edited segment "fairly reflected their personal experiences under the new pay scheme," in that "[a]lmost all of them . . . had failed to achieve at least a 50 percent connection rate." *Id.* Indeed, some technicians may have lacked a full understanding that the back-charge applied only if their connection rate fell below the threshold. *See* Hearing Tr. 391 (J.A. 299). In that context, the Board reasonably concluded, "the failure to fully explain the 50 percent connection rule was at most an inaccuracy," and there "is no basis in the record to find that that technicians knowingly and maliciously withheld that information in order to mislead the viewing public." *MasTec*, 357 NLRB at 107.

Our dissenting colleague opines that, in a separate respect, the employees made maliciously untruthful statements by indicating that they would lose money if they did not lie to customers about the need for a phone connection. *See* Dissenting Op. at 19-20. The dissent agrees that the companies told the technicians to mislead customers into believing that the receivers would not work without a phone connection. *Id.* at 21. But, our colleague reasons, the technicians still could have avoided any back-charge without lying to customers if the technicians disregarded the direction to lie and instead found other ways to improve their connection rates beyond the 50% threshold. Again, however, almost all of the technicians in fact had been unable to achieve that connection rate as a matter of their own actual experience. From their perspective, misleading customers

into thinking there was no choice about a phone connection would have materially improved connection rates (and thus eliminated back-charges)—indeed, that is presumably why the companies essentially told the technicians to lie.

Considered in that light, the Board was not required to find a malicious falsehood in the technicians' indication that they faced continued back-charges if they did not lie. That was exactly their experience. We cannot set aside the Board's findings on this issue as unsupported by substantial evidence.

b.

The next statement at issue concerns a MasTec supervisor's suggestion that technicians should tell customers that a receiver would "blow up" if not connected to a phone line. In the interview segment, a technician referenced that comment by saying: "Tell the customer whatever you have to tell them. Tell them if these phone lines are not connected the receiver will blow up." *MasTec*, 357 NLRB at 105. And when the reporter queried, "You've been told to tell customers that," the technician responded, "We've been told to say that. Whatever it takes to get the phone line into that receiver." *Id.*

The companies contend that the Board ignored the ALJ's credibility-based determination that the "blow up" comment was made in jest. In fact, however, the Board expressly characterized the comment as a "joking suggestion." *Id.* at 107. But the Board determined that, even as a joke, the supervisor's comment "underscored th[e] message" that the technicians should mislead customers if necessary, "as it undoubtedly was meant to do." *Id.* That is at least a reasonable conclusion about the comment given the context in which it was made. Indeed, the MasTec supervisor made the

"blow up" comment in the course of advising technicians to tell customers "whatever you have to tell them" and do "whatever it takes" to connect a phone line. *Id.* at 104. The technician's statements in the interview segment reinforced that context in expressly tying the "blow up" comment to the mandate to tell customers "whatever you have to tell them" and "[w]hatever it takes." *Id.* at 105.

Insofar as the companies argue that the technician's statement rose to the level of being maliciously untrue simply because he did not expressly explain that the "blow up" comment was originally made in jest, we find no reversible error in the Board's decision. To the extent the comment was not self-evidently hyperbolic, the technician's failure to spell that out did not necessarily render his repetition of the comment maliciously untrue. It is undisputed that a MasTec supervisor made the comment, so the technician's repetition of it was not untruthful on its face. Accepting that the comment was originally uttered as a joke, and that the technicians who heard it seem to have understood it that way, it was still part of the companies' telling technicians to do "whatever it takes," including lying to customers, to get receivers connected to phone lines. And because the technician's recounting of the "blow up" comment in the news segment specifically (and accurately) tied the comment to the further direction to say "whatever it takes," he conveyed a sense of the general context in which the comment was originally made.

In those circumstances, the absence of express specification that this particular way of being told to do "whatever it takes" was meant hyperbolically (as opposed to literally) did not require the Board to find that the technician's repetition of the comment was maliciously untrue. Indeed, to the extent the hyperbolic nature of the "blow up" comment

would not have been immediately apparent to a listener, it is hard to see how the comment could have been understood in any other way upon reflection. After all, to believe that the supervisor in fact wanted technicians to tell customers a receiver would blow up without a phone connection, one would have to think that the companies, for some reason, wanted to promote the (false) belief that their product was so dangerous that it was susceptible to exploding in customers' homes. Why, a customer presumably would think, would any credible company sell me a product that might blow up inside my home, much less do so and then supposedly give me a *choice* to eliminate the danger at no cost? A listener to the interview in all likelihood thus would have understood— accurately—that the suggestion to tell customers the receiver might blow up had been made in jest, and that the companies did not in fact want the technicians to propagate the false belief that their product could explode inside a family's home.

That is not to say that the Board necessarily would have been unjustified had it found that the failure to specify the joking nature of the "blow up" comment rendered the statement's repetition a malicious falsehood. But we do not approach that factual inquiry with fresh eyes; rather, under the governing standard, we affirm the Board as long as it could reasonably find the evidence for its conclusions to be adequate. The Board reasonably found that, as with the technicians' failure to explain all the details of the pay policy, the recounting of the "blow up" comment without fully elaborating its context amounted, at most, to an "incomplete statement[]," not a "malicious falsehood[] justifying removal of the Act's protection." *Id.* at 108.

38

c.

Finally, the companies argue that statements in the broadcast linking the technicians' grievances to extra fees for customers were maliciously untrue. In introducing the story at the outset of the segment, a news anchor in the studio said the technicians would be "talking about a company policy that charges you for something you may not ever use." *Id.* at 105. And subsequently, the reporter who interviewed the technicians said that the "lie"—i.e., that a phone connection is necessary to receive a signal—"could cost customers big money . . . the fee to have a phone line installed could be as high as $52.00 per room . . . want a wireless phone jack? That will cost you another 50 bucks." *Id.* The companies contend that those statements were maliciously untrue because the extra charges would apply, not for a standard phone connection, but only for a premium installation in which there would be no visible phone cord.

The reporter, however, stated only that the misleading suggestion about the need for a phone connection "could" result in an added installation cost for customers, not that it necessarily would do so. At any rate, the Board acknowledged that the way the segment described the issue "may have been misleading." *Id.* at 107 n.12. But the Board explained that all of the relevant statements were made by the reporter or other news personnel, not by the technicians themselves. *Id*. And the technicians "testified without contradiction that their only input was in responding to [the reporter's] questions on the day of the interview," and that they had no opportunity to see the segment before it aired. *Id.* The companies note that none of the technicians later disavowed the reporter's statements, and some even characterized the reporter as their "spokesperson" after the broadcast. *See* Hearing Tr. 292-93 (J.A. 255-56). Even so,

given that statements are unprotected only when "made with knowledge of their falsity or with reckless disregard for their truth or falsity," *MasTec*, 357 NLRB at 107 (citing *TNT Logistics N. Am., Inc.*, 347 NLRB 568, 569 (2006)), we will not disturb the Board's finding that the statements by third parties do not meet that standard.

## C.

DirecTV also argues that, even if the technicians had a protected right to criticize their direct employer (MasTec) in connection with their grievances, they had no protected rights vis-à-vis their employer's customer (DirecTV). That argument affords no basis for granting relief to DirecTV. The Act makes clear that, if nothing else, DirecTV committed an unfair labor practice by causing MasTec to terminate its employees. *See* ALJ Op. 17 (J.A. 17). DirecTV is an employer under the Act (and does not argue otherwise). And "[a]n employer violates the Act when it directs, instructs, or orders another employer with whom it has business dealings to discharge, layoff, transfer, or otherwise affect[] the working conditions of the latter's employees" for an unprotected reason. *Dews Constr. Corp.*, 231 NLRB 182, 182 n.4 (1977); *see also Int'l Shipping Ass'n*, 297 NLRB 1059, 1059 (1990) (An employer "may violate Section 8(a) not only with respect to its own employees but also by actions affecting employees who do not stand in such an immediate employer/employee relationship.").

\* \* \* \* \*

For the foregoing reasons, we deny the companies' petitions for review and grant the Board's cross-application for enforcement.

*So ordered.*

BROWN, *Circuit Judge*, dissenting: Twenty-six technicians objected to their employer's new, exacting compensation terms. When their employer refused to relent, they pitched their story to a local news station's consumer watchdog reporter. These employees then appeared on television in an effort to curry public sympathy for their demands. So far, no problem. The NLRA has always blessed organized efforts like these aimed at gaining advantage in a labor dispute.

But when these technicians falsely accused their employer during a television broadcast of certain outrageous business practices, they crossed a line—from labor dispute to public disparagement; from concern about wages and working conditions to a vendetta aimed at undermining the Companies' reputation. True, the NLRA aggressively protects organizing efforts, but the core of the Act is the balance it strikes between employees' and employers' legitimate, conflicting interests. There are limits to how far employees may go in pursuit of bargaining advantage. Those who work within these limits are protected, but those who ignore them, who pursue their ends through inappropriate means, are stripped of the Act's protections.

This is not a close case. Had the MasTec technicians honestly and fairly discussed their labor dispute with the news station, their aggressive tactics could be sustained as a proper appeal to outside parties. *See Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978). But these technicians chose instead to feed the station a false, disparaging story they knew would trigger public outrage. The two most damning lies they told the viewers of WKMG-TV Channel 6 were that their employer (1) required them to lie (it did not), and (2) seriously encouraged them to scare customers into accepting an unnecessary—and excessively expensive—service by warning that the product would "blow up." To be sure, a MasTec supervisor did *jokingly* suggest that, but everyone present understood it to be in jest. By soberly repeating that

joke to a public audience without its context and as though it were a serious instruction, these technicians left the NLRA and its protections behind. As "[t]here is no more elemental cause for discharge of an employee than disloyalty to his employer," *NLRB v. Local Union No. 1229, Int'l Broth. of Elec. Workers*, 346 U.S. 464, 472 (1953) (*Jefferson Standard*), I can't blame MasTec for showing them the door. And frankly, neither can the NLRA.

It's not hard to see why the technicians resorted to these manipulative gambits: an ordinary labor dispute would not be newsworthy, but tales of corporate perfidy and consumer fraud would undoubtedly pique the interest of Channel 6 and the viewing public. Still, self-interest does not excuse mendacity, and MasTec acted well within its rights when it fired these disloyal technicians.

\* \* \*

Of course, as I write in dissent, I'm alone in my view of this case. The court upholds the Board's determination that the NLRA requires employers to suffer insubordination and damaging falsehoods in silence unless they can prove the employees' vindictive mental state. "Common sense sometimes matters in resolving legal disputes." *Southern New England Telephone Co. v. NLRB*, 793 F.3d 93, 94 (D.C. Cir. 2015). Here, however, neither common sense nor the ordinary rules of statutory construction are in evidence—a lacuna that indicts the unconstitutionally generous standards of review through which federal courts routinely cede statutory interpretation to biased administrative tribunals. This case, for example, demonstrates the lengths to which the Board will go to contort an evenhanded Act into an anti-employer manifesto. Instead of attempting to balance conflicting interests, the NLRB reacts like a pinball machine

3

stuck on tilt; reflexively ensuring employers always lose a turn.[1]

## I.

The NLRA prohibits employers from discharging employees for engaging in certain kinds of protected conduct. *See* 29 U.S.C. § 157 ("Employees shall have the right to self-organization, to form, join, or assist labor organizations . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."). This provision doesn't lend employees unconditional cover, however. Instead, they are only protected to the extent their conduct is (1) "related to an ongoing [labor] dispute" *and* (2) "not so disloyal, reckless, or maliciously untrue as to lose the Act's protection." *In re American Golf Corp.*, 330 NLRB 1238, 1240 (2000); *see also Jefferson Standard*, 346 U.S. at 477. This has been the Board's rule for dischargeable disloyalty—until today.

---

[1] The Board's analysis hinges on hedges. *See, e.g.*, Op. 23 (quoting the Board finding "the technicians' conduct was not '*wholly incommensurate* with [their] grievances'"); *id.* 32 ("The Board concluded that, '*for the most part*,' the technicians' statements in the news segment 'were accurate . . . .'"); *id.* ("'Any *arguable departures* from the truth,' the Board found, 'were no more than good-faith misstatements . . . .'"); *id.* ("In fact, the Board agreed that the technicians were not *explicitly* told to lie; it simply found that they were '*essentially* told to lie.'"); *id.* 34 ("[T]he Board reasonably concluded, 'the failure to *fully explain* the 50 percent connection rule was at most an inaccuracy'"); *id.* 38 ("[T]he Board acknowledged that the way the segment described the issue '*may have been misleading*.'") (emphasis added). Do not be misled—the Board's overuse of adverbs and qualifiers is a sign of evasion, not precision. *See* Stephen King, ON WRITING 117-22 (2002).

4

Much like the NLRA itself, this rule mediates the conflicting rights of employers and employees. On one hand, "there is no more elemental cause for discharge of an employee than disloyalty to his employer." *Id.* at 472; *see also* 29 U.S.C. § 160(c) ("No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause."). On the other, employees enjoy a right to engage in concerted activity, which can include public criticism of an employer's labor policies. When employees are fired for their conduct during a labor dispute, a "difficulty arises." *Jefferson Standard*, 346 U.S. at 475. Were they fired for disloyalty, or for protected conduct their employer happened to dislike? This case involves precisely that difficulty.

Because in my view the technicians seized a public opportunity to sharply attack the Companies' business policies and harm their reputation with false statements, I would grant the Companies' petition. The Board's two determinations—that the technicians' actions and statements were not "so disloyal" or "maliciously untrue"—violated circuit precedent and were unsupported by substantial evidence. More fundamentally, the frameworks underpinning both of the Board's determinations are themselves unfaithful to the NLRA and Supreme Court precedent.

A.

The court majority upholds a Board determination that excused a series of disparaging, false remarks several employees made during a television broadcast to a journalist whose only interest was in exposing and publicizing corporate wrongdoing harmful to consumers. In reaching that conclusion, the Board ignored binding circuit precedent; by

accepting the Board's action, the majority eviscerates that precedent. But, we are not the only court to have construed the NLRA. Even if the Board could excuse itself from our precedents (an option I do not concede) and a panel of this court could rewrite an inconvenient case (an alternative ordinarily available only with the acquiescence of the full court), the text of the NLRA and the Supreme Court's interpretation of it *still* preclude the Board's result.

1.

Our controlling decision in *George A. Hormel & Co. v. NLRB*, 962 F.2d 1061, 1065 (D.C. Cir. 1992), requires we grant the Companies' petition. To see why, let's examine what the Board determined. As to whether the technicians' conduct was sufficiently disloyal to lose NLRA protection, the Board concluded:

> "While the technicians may have been aware that some consumers might cancel the [Companies'] services after listening to the newscast, *there is no evidence that they intended to inflict such harm* on the [Companies] or that they acted recklessly without regard for the financial consequences to the [Companies'] businesses. *We therefore find* that the technicians did not engage in unprotected disloyal or reckless conduct."

*Mastec Advanced Techs*, 357 NLRB 103, 108 (2011) (emphasis added). Note this paragraph's animating logic: because there was no evidence of intent to harm their employer, the employees' harmful statements were not sufficiently disloyal. There's one small problem with this subjective approach to disloyalty: we expressly—and unequivocally—rejected it. *See Hormel*, 962 F.2d at 1065.

In *Hormel*, an employee was fired for attending a rally supporting a boycott of his employer. The Board purported to examine the employee's subjective intent and concluded he did not intend any disloyalty. We reversed. Differing views on the relevance of employee intent accounted for these opposing conclusions. The Board required the employer to show it reasonably believed (from the "ostensible evidence") that the employee "personally embraced" the boycott. *See George A. Hormel & Co. and Robert W. Langemeier United Food and Commercial Workers International Union, Local Union No. 22,* 301 NLRB 47, 87 (1991). We disagreed, explaining such a "subjective test" couldn't be squared with the NLRA's "statutory policy of preserving the employer's right to discharge an employee for disloyalty." *Hormel*, 962 F.2d at 1065. The question should have been whether "any reasonable observer" would infer the employee acted in furtherance of disloyal behavior (the boycott), not whether the employee intended to be disloyal. *Id.* at 1066.

*Hormel*'s holding was quite clear: the NLRA "requires an *objective* test of disloyalty." *Id*. at 1065 (emphasis added). In our view, requiring employers to assess intent "would so circumscribe as to defeat the employer's right to discharge an employee who is working against the employer's business interest." *Id.* An employee may wear a pro-boycott t-shirt because he "likes the colors" or to fit in with friends, but "[w]hatever his reason, that employee is unquestionably promoting the boycott. Anyone who sees him gets that message." *Id.* The employer has a right to fire that disloyal employee no matter what he intended, but "under the Board's subjective test, the employer could not lawfully discharge him without showing" the employee wore the shirt "to actually encourage or support the boycott." *Id.*

Today's majority excuses the Board's obvious circumvention of *Hormel,* rather than apply its clear holding. According to the Board, what protected these technicians wasn't a lack of evidence that they disparaged the companies, but a lack of evidence they *intended* to do so. *See Mastec,* 357 NLRB at 108. This decision is identical to the analysis reversed in *Hormel,* requiring employers to assess intent before punishing objectively disloyal behavior. That approach violates the NLRA. 962 F.2d at 1065.

The court's rewriting of *Hormel* renders this once-vibrant precedent a mere rain shadow to the mountain the majority would have employers climb. The majority rescues the Board by distinguishing *Hormel* in two ways, one irrelevant and the other incorrect.

First, the majority insists *Hormel* "addressed a different question than the one at issue here," Op. 25, that is, addressing the propriety of subjective tests *only* as to whether an act of disloyalty occurred, not as to whether that act was "flagrantly disloyal." *Id.* Consequently, the majority claims *Hormel* poses no obstacle to considering "an employee's [subjective] intentions" to "shed meaningful light on" "the degree and nature of his disloyalty," i.e., to determine "flagrant" disloyalty. Op. 27. The result is unintelligible. *Hormel* now precludes reliance on the employee's subjective intent to determine whether the employee's conduct was disloyal, but permits the employee's subjective intent to determine the "degree and nature" of disloyalty. Tellingly, the majority attempts to reassure us *Hormel* retains precedential value—to its own facts. *See* Op. 26 ("That is a meaningful limitation [on the use of subjective intent], especially in circumstances like those in *Hormel. . . .*").

8

The majority is of course correct that the specific question in *Hormel* ("did he do it?") is different from the one at issue here ("was it flagrantly disloyal?"). But, remember, *Hormel* rejected the subjective approach in order to vindicate "the statutory policy of preserving the employer's right to discharge an employee for disloyalty," 962 F.2d at 1065, a right the Supreme Court described as "elemental" and "plain," *Jefferson Standard,* 346 U.S. at 472, 475. How can a statutory policy be threatened by the use of subjective intent to determine disloyal conduct, but *not* be threatened by using subjective intent to determine the "degree" of disloyalty? How can an employer's right to discharge for disloyalty be "elemental" and "plain" when it hinges on an employee's subjective intent? The answer is self-evident: It cannot. Only by adding an unwarranted gloss to the meaning of disloyalty and subtracting from the law as articulated by the Court can the majority fashion its purported distinction. This is revealed in the majority's *sub silentio* reversal of *Hormel*'s holding that the disloyalty inquiry is "a matter of law." *Compare* 962 F.2d at 1066 *with* Op. 29 ("The question of whether employee conduct is so disloyal as to fall outside the Act's protection is an inherently fact-intensive, context-dependent one."). Such an outcome does a disservice to the rule of law. *Hormel*'s broad rationale vindicated a clear statutory policy against using subjective intent to determine disloyal behavior. Its logic applies with equal force to preclude subjective intent from determining the degree of disloyalty. And it must, otherwise its insistence on an objective test would be pointless.

Second, the majority incorrectly argues it was the Board's reliance on subjective *evidence* of intent that offended the *Hormel* court, rather than reliance on intent altogether. To the court majority, *Hormel* prohibits measuring employee intent by reference to a purely subjective

standard (what's in the employee's "heart of hearts"), but not through objective evidence. Op. 27. Because the Board used subjective intent to "shed meaningful light on" "the degree and nature of his disloyalty," Op. 27, the court majority believes the Board's analysis was consistent with *Hormel*, which the majority characterizes as "establish[ing] that an employee of course cannot disclaim an action that rings out as disloyal to all the world by contending that he in fact did not intend to act disloyally." Op. 25.[2]

But, *Hormel* cannot be read, as the majority does, to permit consideration of employee intent through objective evidence. *Hormel* reversed a Board decision *that took precisely that approach*. *See* 301 NLRB at 87 (finding a lack of "any *ostensible* evidence of their support of a boycott") (emphasis added). The *Hormel* ALJ gauged the employee's "actual boycott motivation" (intent) by marshalling a litany of objective evidence on both sides, *see id.* at 84, which was adopted in full by the Board, along with the rest of the ALJ's recommended Order. Our opinion in *Hormel* recited the ALJ's consideration of this evidence. *See* 962 F.2d at 1065-66. Based on these *objective* indicia of intent, the ALJ concluded "the evidence is actually very weak that [the employee] ever personally embraced a boycott."[3] 301 NLRB

---

[2] The majority attempts to cabin *Hormel* factually too, claiming that its "sole" disloyalty analysis dealt with "post-dispute conduct." Op. 24. One of the Board's many hedges describes this characterization—it is not "wholly incommensurate" with the facts, but it is not the full story. *Hormel* is clear that the post-dispute consumer boycott of Hormel's products was an "exten[sion]" of labor dispute activity. *See* 962 F.2d at 1063.

[3] Among this serial accounting of objective evidence, the ALJ listed *one* "purely subjective" indication of the employee's intent. He observed: "[The employee] has testified relatedly, and I find credibly, that he didn't believe in the effectiveness of the boycott."

at 87.  Put differently, the evidence didn't show the employee intended to disparage Hormel, and thus his discharge was unlawful.  We rejected that conclusion.  To us, *the mere fact of the employee's presence at the boycott* was enough to justify his termination.

Significantly, the *Hormel* court didn't reverse merely because it disagreed with the Board's weighing of competing indicia of intent, a result that would have justified the majority's view that *Hormel* blessed examination of intent through objective evidence.  If so, we simply could have said the Board downplayed what we saw as the most obvious indicia of intent:  Langemeier's presence at the rally.  No, our rationale was more fundamental.  We rejected the Board's entire *approach*, concluding it was not "a permissible construction of the NLRA" because it "circumscribe[d]" the employer's right to fire disloyal employees.  *Hormel*, 962 F.2d at 1065; *see also id.* ("The Board's subjective approach does not, however, entail a permissible construction of the NLRA because it is inconsistent with the statutory policy of preserving the employer's right to discharge an employee for disloyalty.").  *Where the Board sought objective evidence of intent, we sought objective evidence of disparagement.  Intent was irrelevant.*  All that mattered was that the employee attended the boycott (without expressly disclaiming support for it).  The discharge was lawful because "any reasonable observer would have to infer" that conduct furthered a disloyal action (the boycott).  *Id.* at 1066.  It did not matter

---

301 NLRB at 84.  However, the *Hormel* court never cited this; the opinion instead seems to encompass all of the evidence bearing on whether the employee "personally embraced" the boycott.

*why* Langemeier participated; only that he did in fact participate.[4]

Thus, the *Mastec* Board's opinion is virtually indistinguishable from the one we reversed in *Hormel*. Just as the Board claims it relied on "objective criteria" to gauge whether MasTec technicians "intended to inflict . . . harm" on the companies or "withheld information in order to mislead the viewing public," the *Hormel* ALJ sought to gauge the employee's "actual boycott motivation" by examining "ostensible evidence." In each case, the Board found the termination unlawful due to a lack of evidence that the employees intended to disparage or harm their employers. Assuring us that its examination drew on objective rather than subjective indicia doesn't magically sanitize an inquiry that should have disregarded intent in the first place. No matter how objective the indicia, they are by the Board's admission still probative of the technicians' *subjective* intent. That inquiry is, according to our binding opinion in *Hormel*, barred by the NLRA.

By dismissing *Hormel* based on irrelevant and incorrect distinctions, the majority has, inappropriately, confined *Hormel* to its specific facts, and severely weakened the important protections afforded to employers through the second prong of the *Jefferson Standard*-inspired test. Unfortunately, sacrificing circuit precedent is not enough to save the Board's result—the majority must also ensure that not even the Supreme Court is allowed to stand in the way of the Fourth Branch.

---

[4] Perhaps there is some intent component to acting in furtherance of the boycott. Hormel may not have been able to fire the employee if he was sleepwalking or totally unaware of the purpose of the event.

Nothing in *Jefferson Standard* supports an analysis of "flagrant" disloyalty contingent upon subjective intent. Indeed, nothing in *Jefferson Standard* suggests terminable disloyalty must be "flagrant." Yet, the majority gives *Jefferson Standard* a dress-down similar to the one *Hormel* received: death by incorrect and irrelevant distinction.

First, the incorrect distinction: After citing the two-part test for dischargeable disloyalty inspired by *Jefferson Standard* (protecting employees from discharge when their conduct is (1) related to an ongoing labor dispute and (2) not sufficiently disloyal), the majority claims *Jefferson Standard* is in "contrast" with this case because it only dealt with the first prong. Op. 18 ("In *Jefferson Standard*, the handbill in question fell outside the Act's protection because it simply attacked the quality of the company's product without indicating any connection to the ongoing employment controversy."). This is mistaken.

*Jefferson Standard* "agree[d]" the employees did not satisfy the second prong. *See* 346 U.S. at 472 ("[T]he handbill [w]as a demonstration of such detrimental disloyalty as to provide 'cause' for" termination). Still, the majority insists "*Jefferson Standard* had no occasion to address the [second prong]." Op. 19. But not only did *Jefferson Standard* have "occasion" to address the second prong (see above), it said the employees' disloyalty rendered irrelevant any satisfaction of the first prong. *See* 346 U.S. at 477-78 ("Even if the attack were to be treated, as the Board has not treated it, as a concerted activity wholly or partly within the scope of those mentioned within § 7 [of the NLRA], *the means used by the technicians in conducting the attack have deprived the attackers of the protection of that section*, when read in the light and context of the purpose of the Act.") (emphasis added). The majority "reads that sentence to

13

pertain to the first-step inquiry, not the second step." Op. 19. By this, I take the majority to mean, since the handbill failed to "indicate a connection to an ongoing labor dispute . . . the handbill . . . would have been deemed unprotected [by the Court] even if the Board had found otherwise," *id* (emphasis omitted). This makes no sense. If the handbill did not "indicate a connection" to the ongoing labor dispute, then how could the Board have possibly concluded it satisfied the first prong? The majority provides no answer.

The logical conclusions from *Jefferson Standard* are: (1) the handbill was sufficiently disloyal to merit termination; (2) the Board did not decide whether satisfying the first prong would affect the employer's right to terminate; and (3) even if the Board found the first prong satisfied, the "means," i.e., the handbill's disparaging contents, were sufficiently disloyal to merit termination. Sadly, none of these conclusions are clear after today's decision (tellingly, the majority cites the Board's subsequent precedent to justify its reading, not *Jefferson Standard*, *see* Op. 19).

The framework endorsed by the incorrect distinctions with *Jefferson Standard* and *Hormel* makes it impossible for disloyal and disparaging employee behavior to be the basis for termination, so long as it is connected to an ongoing labor dispute. Indeed, in endorsing the Board's examination of the technicians' subjective intent, the majority goes so far as to accept the "relat[ion]" itself as valid evidence undermining any finding of disloyalty.[5] *See* Op. 22, 16. Going forward, it

---

[5] The majority attempts to also relegate *Hormel* and another of our precedents, *Endicott Interconnect Techs., Inc. v. NLRB*, 453 F.3d 532 (D.C. Cir. 2006), into the same first prong box it places *Jefferson Standard*. *See* Op. 24-28. But it beggars belief to conclude that *Hormel* and *Endicott* do not bear upon dischargeable disloyalty because the relationship with an ongoing labor dispute

is difficult to see how employee behavior could satisfy the test's first prong and nonetheless still fail the second. This is the paradigmatic case, but the court sides with the employees anyway.

## 2.

Now, the majority's irrelevant distinction with *Jefferson Standard*: The court accepts the Board's rule that only "flagrantly disloyal" and "wholly incommensurate" behavior is unprotected. The majority claims this rule follows from *Jefferson Standard*. In reality, however, the majority transforms the *recounting* of terminable disloyalty in some cases into a *requirement* for terminable disloyalty in all cases.[6] The net result is an artificial narrowing of terminable disloyalty.

Even before the pro-employer Taft-Hartley amendments were added to the NLRA, the Supreme Court recognized the Act protected an employer's right of discharge. Writing for

---

was not met. The test contains two prongs that must *both* be met for the employee to be protected—failing to meet *either one* means the employee does not enjoy NLRA protection (making the majority's frequent characterizations of these prongs as "steps" inappropriate). There is no need, therefore, to establish a relationship between the employee's activity and an ongoing labor dispute if disloyalty is proved. In fact, *Endicott* expressly did not decide the first prong and nevertheless found disloyalty justifying discharge. *See* 453 F.3d at 537 n.5; *id.* at 538 (Henderson, J., concurring).

[6] In fact, this is the first time any circuit court in the country has commented on, let alone accepted, this language. Our previous opinions cite only the Board's original formulation of the rule, that the conduct is "not so disloyal, reckless, or maliciously untrue as to lose the Act's protection." *See, e.g.*, *Endicott*, 453 F.3d at 537.

15

the Court in 1937, Chief Justice Hughes admonished the Board not to use its authority as "a pretext for interference with the right of discharge when that right is exercised for other reasons than [] intimidation and coercion." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 46 (1937). Quoting this language, the *Jefferson Standard* Court declared that the principle that "disloyalty is adequate cause for discharge is plain enough," 346 U.S. at 475, and that "[t]here is no more elemental cause for discharge . . . than disloyalty," *id.* at 472.[7] That right doesn't dissolve as soon as a labor dispute arises. *See id.* at 477–78 ("Even if the attack were to be treated . . . as a concerted activity . . . the means used . . . have deprived the attackers of the protection of [the Act]."). Employees may engage in concerted activity; however, the NLRA doesn't immunize disloyal behavior. *But see* Op. 21. *Jefferson Standard* itself confirms this point. When commenting that the *nature* of the employees' disloyalty would be terminable even if it were connected to an ongoing labor dispute, the Court cites a wide range of behavior. *See* 346 U.S. at 478 n.13. From assault to failing to make deliveries to avoid crossing a picket line, *see id.*, the varying forms of disloyalty cited by *Jefferson Standard* debunk the notion that only "flagrant" disloyalty can trigger the "plain" right of discharge.[8]

---

[7] The Court's "plain" and "elemental" descriptors for "the right of discharge" for disloyalty, and its treatment of the right as pre-dating the NLRA, evince that Act's harmony with the longstanding common law duty of loyalty from which the right to discharge for disloyalty follows. Our insistence in *Hormel* on "an objective test of disloyalty" under the NLRA confirms the same. *See* 962 F.2d at 1065 (citing THE COMMON LAW to say that "[a]cts should be judged by their tendency under the known circumstances, *not by the actual intent which accompanies them*") (emphasis added).

[8] To be sure, the Court didn't explain why the particular means used by these employees deprived them of the Act's protection. But that

But, something very strange happened after *Jefferson Standard*. The Board gradually weakened the very right the Court went out of its way to vindicate. Presently, employers may only fire "*flagrantly* disloyal" employees whose behavior is "*wholly incommensurate* with *any* grievances they might have." *See Mastec*, 357 NLRB at 108 (emphasis added). Anything less than flagrant disloyalty must be taken on the chin.

This rule is "wholly incompatible" with *Jefferson Standard*'s insistence that an employer's right to fire disloyal employees is "elemental" and "plain." Twenty-two years after *Jefferson Standard*, the gloss that would ultimately swallow the plain text made its first appearance—*not as a rule, but as a description* of a specific employee's conduct toward his employer. *Firehouse Restaurant*, 220 NLRB 818, 825 (1975). Three years later, the language re-appeared, *again not as a rule but this time as an observation* about the kinds of cases in which the Board had found concerted but disloyal activity lost NLRA protection. *See Veeder-Root Co.*, 237 NLRB 1175, 1177 (1978) (observing that in cases of

---

does not mean we must infer their means were therefore "flagrant." The Board's prior statement of the disloyalty analysis, as we approved in *Endicott*, strikes me as quite reasonable. *See* 453 F.3d at 537 (approving that the concerted activity be "not *so* disloyal . . . as to lose the Act's protection") (emphasis added). There seems to be a significant difference between "flagrant" disloyalty and conduct that is "so" disloyal it is unprotected. The majority concludes otherwise, equating them as "various formulations." *See* Op. 22. But if that is true, and "flagrant" disloyalty is thus a requirement stemming from *Jefferson Standard*, then the majority should explain, for example, how, in light of today's decision, an employee's failure to make obliged deliveries to avoid crossing a picket line constitutes "flagrant" disloyalty. *See Jefferson Standard*, 346 U.S. at 478 n.13.

flagrant, wholly incommensurate disloyalty, "the Board has held disciplinary action to be justified"). The language was more explicitly adopted as a guiding standard one year later in *Richboro Community Mental Health Council*, when the Board rejected an employer's disloyalty argument for not meeting the historical standard described in *Veeder-Root*. 242 NLRB 1267, 1267-68 (1979) (holding that while "flagrantly disloyal, wholly incommensurate" conduct can forfeit NLRA protection, "such is hardly the case here"). From description to observation to standard, the Board slowly, surely chipped away at a right of employers the Supreme Court had made a deliberate effort to protect.

Finally, in the decision we're reviewing today, the Board's gradual, decades-long evisceration of the employer's discharge right culminated in its strongest invocation of this language yet. For the first time, the Board made its requirement of flagrant and wholly incommensurate disloyalty explicit by framing it in conditional terms: "The Board has stated that it will not find a public statement unprotected unless it is 'flagrantly disloyal, wholly incommensurate with any grievances which they might have.'" *Mastec*, 357 NLRB at 108.[9]

---

[9] For what it's worth, I find no support in the NLRB's decision for that statement. Prior to *Mastec*, the Board had never "stated that it will not find a public statement unprotected unless" it is "flagrantly disloyal" and "wholly incommensurate." The decision it cites for this proposition, *Five Star Transportation, Inc.*, stated only that it will consider whether "the attitude of the employees is flagrantly disloyal [and] wholly incommensurate . . . ." 349 NLRB 42, 45 (2007). Not a single NLRB decision characterizes the "flagrantly disloyal"/"wholly incommensurate" language in the conditional language employed in *Mastec*. The Board's statement that it had stated the rule in conditional terms is incorrect.

18

What we are confronted with, then, are two incompatible propositions. On the one hand, the Supreme Court insists that an employer's right to discharge an employee for acts of disloyalty is "elemental" and "plain enough." On the other, the NLRB cautions that where concerted activity is concerned, the employers' right extends only to acts of *flagrant* disloyalty. The NLRB's modifier is wholly absent from, and incompatible with, *Jefferson Standard*. While I recognize the Board's special authority to "appl[y] the general provisions of the Act to the complexities of industrial life," *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236 (1963), that authority should not permit it to erode Supreme Court precedent—especially when that precedent interprets the agency's authorizing statutes.

B.

The majority also upholds the Board's determination that the technicians' statements were not "maliciously untrue." The "maliciously untrue" standard is another invention of the Board, designed especially to deal with a particular sub-species of disloyalty: false statements. Under this standard, false statements are unprotected if "made with knowledge of their falsity or with reckless disregard for their truth or falsity." *Mastec*, 357 NLRB at 107.

The Companies charge the technicians with conveying at least three maliciously untrue sentiments: (1) the technicians were required to lie; (2) they were seriously encouraged to tell customers their receivers would "blow up" if not connected; and (3) customers are charged per connection. The Board rejected the Companies' claims, and the majority now concludes substantial evidence supported that determination.

19

I disagree.  In my view, the Board's determinations with respect to at least the first two sets of statements are unsupported by substantial evidence.

1.

In their interview, the technicians falsely stated they were required to lie to customers.  One technician said, "If we don't lie to the customers, we get back charged for it."  Following the reporter's observation that "It's either lie or lose money," another said, "We don't have a choice."  Even if one accepts the court's conclusion that the technicians were "essentially told to lie," that fact does not justify their additional assertions either that they had no "choice" but to lie or that if they didn't "lie to the customers [they'd] get back charged for it."  The technicians who made this assertion knew it was false, their response validated the reporter's characterization—"[i]t's either lie or lose money"–and it unquestionably disparaged the reputation of the Companies.

The key fact, that *at no point in any of the training did MasTec threaten back charges for technicians who refused to lie*, is one the technicians must have known.  That, of course, would have been absurd.  It is not "lying" that triggers back charges, but rather the failure to convince a customer to connect.  Even if lying might be *one* way to sell a connection, it is obviously not the *only* way.  An improved sales pitch alone could do the trick.  After all, customers receive certain benefits from connecting, such as remote control pay-per-view, caller-ID integration, and access to system updates.

Sure, as the majority suggests, had the technicians explained that getting a 50% connection rate is difficult and that sometimes they *felt* as though lying was the only way to avoid back charges, this would be a very different story.  That

(truthful) description would have fairly and still sympathetically illuminated the nature of their grievance, which was that complying with MasTec's policies was so difficult that lying seemed an inescapable temptation, one MasTec even encouraged. *But what they actually said paints a far more damning picture of the Companies.* The fact that they chose to tell a blatant lie, particularly where the truth was more than adequate to the task, suggests to me their decision was "reasonably calculated to harm the compan[ies' respective] reputation[s]." *Jefferson Standard*, 346 U.S. at 471.

Hedging, the Board retreated to what has become its favorite haven; one the majority has ensured will remain safe. "In any event," the Board explains, any inaccuracies are excusable since "[t]here is no basis in the record to find that the technicians knowingly and maliciously withheld that information *in order to mislead the viewing public*." *Mastec*, 357 NLRB at 107 (emphasis added). The majority says it "cannot set aside the Board's findings on this issue as unsupported by substantial evidence." Op. 35. But there is an obvious reason to set aside that finding: it is not in accordance with the law as established by *Hormel*'s explicit rejection of a subjective disloyalty test. The purpose for which these technicians withheld information hardly matters at all. Whether it was to mislead the viewing public, or merely for kicks and giggles, all that matters is whether they knowingly conveyed disparaging information they knew was false. Because they clearly did, I respectfully dissent.

2.

Moreover, I would also conclude the Board erred in concluding the technicians' repetition of a joking suggestion as though it were serious was not problematic. In training, a

MasTec supervisor jokingly suggested the technicians should tell the customers their receiver will blow up if it is not connected to a phone line. Martinez, a former technician, repeated the joke on the newscast as though it were a serious suggestion. The exchange proceeded as follows:

> Journalist: Want to avoid a deduction on your paycheck? Well, according to this group, supervisors have ordered them to do or say whatever it takes.
>
> Martinez: Tell the customer whatever you have to tell them. Tell them if these phone lines are not connected the receiver will blow up.
>
> Journalist: You've been told to tell customers that . . .
>
> Martinez: We've been told to say that. Whatever it takes to get that phone line into that receiver.

The specific question before the Board was whether it was maliciously untrue to relay these statements without also revealing they were made in jest. The answer should have been plain enough: omitting the context communicated the false impression that the technicians were, in fact, told to tell an outrageous lie to customers. Because it was obvious to all present that the MasTec supervisor's suggestion wasn't serious, Martinez knowingly conveyed false information to the viewing public.

To be sure, while MasTec technicians were not told to mislead customers in *this* way, they were told to mislead them in another way. They were encouraged to tell customers that the receiver wouldn't work unless it was connected to the phone line, which was untrue. In the Board's view, this fact sanitizes the lie Martinez told the viewers of Channel 6.

MasTec may not have actually encouraged technicians to warn about receivers blowing up, but because they did encourage them to lie in other ways his statements "underscored that message" and were therefore not maliciously untrue. *See Mastec*, 357 NLRB at 107.

But just because the technicians were encouraged to mislead customers in one way doesn't justify Martinez's false assertion that the technicians were encouraged to mislead customers in this *particular* way. This "give an inch, take a mile" approach assumes (incorrectly) that the effect of the two statements would have been the same. For obvious reasons, that wouldn't be so.

From Martinez's actual assertion, viewers were left with an impression that MasTec and DirecTV are so profit-hungry that they instructed their technicians to tell outrageous, fear-mongering lies. Indeed, to understand that fear mongering was the interview's purpose we need look no further than the segment's summation. *See* Op. 11 (quoting Alvarez (reporting) to say "*the attorney general's office is looking into this newest issue* so we'll, of course, keep you posted") (emphasis added).

If evidence of subjective intent did have any relevance here, the reporter's sensationalizing points us to the smoking gun (which the *MasTec* Board assiduously ignored): *the fact that the technicians purposely chose a media forum that focused almost exclusively on consumer fraud.* Absent an intention to harm the reputation of the Companies and warn consumers not to do business with them, the Channel 6 program would have no interest in airing this segment. This is exactly what the ALJ—the initial fact finder—concluded, *even when applying the Board's own "flagrantly disloyal"*

*standard*:[10] that employees' desire to undermine the Companies' reputation "overshadowed the labor dispute." *See* APPX019 ("[T]hese statements [that the technicians were instructed or encouraged to lie to customers] . . . apparently enticed the TV station to even do a story about Respondents' business.").

Had Martinez chosen instead to tell the truth, the viewers would still have been presented with a damning picture of these companies, but one far less worthy of outrage. To be sure, deceptive business practices may aggravate consumers. But the more brazen and glaring the deception, the more contempt it earns.

Here again, as with the first set, the truth was all the technicians needed to achieve their goal of currying public sympathy. Choosing instead to hedge their bets with a few malicious falsehoods, Martinez launched "a sharp, public, disparaging attack upon . . . the companies' . . . business policies, in a manner reasonably calculated to harm the company's reputation and reduce its income." *See Jefferson Standard*, 346 U.S. at 471.

3.

More fundamental than my disagreement over what the record demonstrates, I question both the relevance and propriety of the Board's "maliciously untrue" framework.

---

[10] The majority repeatedly notes the Companies do not challenge the Board's standard. *See, e.g.*, Op. 14, 18, 22, 31. Why should they? *Applying* Hormel*'s objective standard, the ALJ found for the Companies even under the Board's stringent standard.* Perhaps the majority is suggesting *any* judicial questioning of the Board's standard is beyond the pale. I hope not. Judicial review should mean more than batting cleanup for the administrative state.

Indeed, it is unclear why the Board is concerned with a statement's malicious falsity at all. *Jefferson Standard*, the supposed inspiration behind this framework, established an employer's right to punish employees for "disloyalty"—or, "disparaging attack[s] upon the quality of [their employer's] product and its business policies, in a manner reasonably calculated to harm the company's reputation and reduce its income." 346 U.S. at 471. Determining that a statement is "maliciously untrue" is an unnecessary detour, at least as far as *Jefferson Standard* is concerned, because we'd still need to decide whether the maliciously untrue statement is sufficiently disloyal.

The only way to make sense of this framework is to assume the Board treats maliciously false statements as *per se* disloyal. Otherwise, there is no need for this separate analysis, especially since any time a false statement is something less than malicious—which is typical given how high a bar that is—the Board nonetheless still must examine whether it was "not so disloyal." But the majority and the Board disclaim a *per se* approach to determining disloyalty. *See, e.g.*, Op. 27. In sum, the majority's approach cannot even claim internal logic.

## II.

In a future case where we hopefully restore the precedent we gut today, we should require more faithful adherence to the equipoise envisioned by the Court in *Jefferson Standard*. A proper view of the NLRA, according to the Court, requires proper attention both to the employees' right to air grievances and the employer's right to punish disloyalty. Thus, restoring the original spirit of *Jefferson Standard* requires carefully defining the hallmarks of disloyalty. Fortunately, decisions

by various courts of appeals and even the NLRB provide some useful suggestions.

For instance, we have held employee conduct is disloyal when it disparages "the quality of the company's products and its business policies." *Endicott*, 453 F.3d at 536. There, the employee was terminated for commenting publicly that his employer lacked "good ability to manage," was causing the business to "tank[]," and was going to "put it in the dirt," and we upheld the termination as consistent with *Jefferson Standard*. *Id.* at 537. Conversely, where employee conduct did not contain "any remarks or materials disparaging the quality of products of the employer," we concluded such conduct did not "bring the case within the rationale of [*Jefferson Standard*]." *Allied Indus. Workers, AFL-CIO Local Union No. 289 v. NLRB,* 476 F.2d 868, 879 (D.C. Cir. 1973). Thus, where there's no disparagement of the employer's product or practices, there's no cause for termination.[11]

Other courts of appeals, as well as the NLRB, have also examined the following two factors: (1) "whether the appeal to the public concerned primarily working conditions," and (2) "whether it avoided needlessly tarnishing the company's image." *NLRB v. Mount Desert Island Hosp.*, 695 F.2d 634,

---

[11] An important note: nearly every public, concerted activity by employees or unions will cause *some* harm to employers, but that "does not alone render them disloyal." *Mohave Elec. Coop., Inc. v. NLRB*, 206 F.3d 1183, 1189 (D.C. Cir. 2000); *see also Five Star Transp., Inc. v. NLRB*, 522 F.3d 46, 53–54 (1st Cir. 2008) ("Indeed, were harm or potential harm to the employer to be the determining factor in the Court's [] protection analysis, it is doubtful that the legislative purposes of the Act would ever be realized."). What matters, it seems, is disparagement of the employer's products or business practices, not its labor practices.

640 (1st Cir. 1982); *see also Technicolor Gov't Serv's*, *Inc.*, 276 NLRB 383, 388 (1985) (holding that "disloyalty" turns on whether, in context, "it was necessary to legitimate employee ends"). As public, concerted activity will inherently cause some harm to an employer's image, this approach suggests that, to avoid acting disloyally, employees must be cautious not to harm the employer's image more than is necessary or appropriate.

Another possible test for disloyalty finds expression in our en banc decision in *Diamond Walnut Growers, Inc. v. NLRB*, 113 F.3d 1259 (D.C. Cir. 1997) (en banc). Though technically implicating a different line of Supreme Court precedent (*NLRB v. Fleetwood Trailer Co., Inc.*, 389 U.S. 375 (1967), not *Jefferson Standard*), the court's analysis resonates in both. There, an employee was terminated for participating in a strike and international boycott of his employer's product. That boycott referred to the employer's workforce as "'scabs' who packaged walnuts contaminated with 'mold, dirt, oil, worms and debris.'" *Id.* at 1261. And in determining whether the employer had "substantial justification" for terminating the employee, the court considered whether the resolution of the underlying labor dispute would remove the taint brought on by the employee's conduct. The court concluded:

> "The company's ability to sell the product, even if the strike is subsequently settled, could well be destroyed. If a customer becomes apprehensive to bite into Diamond's walnuts because of a concern at finding an impurity (even part of a worm), it is unlikely that a strike settlement will eliminate that visceral fear."

*Id.* at 1267. Because a strike settlement would not likely reassure prospective buyers that they can safely snack on

these walnuts without fear of also chewing into a worm, the employer justifiably terminated the employee.

Each of the foregoing examples suggests that determining disloyalty demands investigation into how the labor dispute and the disloyal activity fit together. Activities focused on working conditions that avoid needlessly tarnishing the company's image will not be deemed "so disloyal" even if they cause some harm to the employer's reputation. But when employees get carried away, lose sight of the labor dispute, and cross the Rubicon into disparaging their employers' products or business practices or inflicting needless or irredeemable damage to their reputation, they forfeit the NLRA's protection.

In my view, that's what happened here. The technicians' disloyalty stems from their statements accusing MasTec and DirecTV of deceptive business practices. These statements display all the hallmark attributes of disloyalty discussed above. As in *Endicott*, what these technicians alleged constitutes disparagement of the "quality" of the companies' "business policies." 453 F.3d at 537. And consistent with *Diamond Walnut*, it is hard to imagine that a resolution of this labor dispute would remove the distaste local customers (and potential customers) likely have toward these allegedly crooked companies. 113 F.3d at 1268. Finally, unlike in *Mount Desert*, the false allegations they hurled at MasTec and DirecTV were not "intertwined inextricably with complaints of working conditions," nor were they "necessary to effectuate employees' lawful aims." 695 F.2d at 640–41. To be sure, the employees' discomfort about lying to customers is certainly related to the labor dispute. *Again, had their public complaints actually focused on what MasTec encouraged them to say, there may have been a strong case that these statements were necessary to effectuate their lawful*

*aims.  But they said none of these things.*  Rather, their statements on the broadcast were confined to false allegations that they were required to lie and that they were seriously encouraged to tell customers their receivers would blow up if they didn't connect a phone line.  By falsely suggesting they were required to lie, and to lie so preposterously, they "needlessly tarnish[ed]" MasTec and DirecTV's image.  Consequently, their termination was justified.

As things stand now under this court's imprimatur, the Board will continue to force employers to endure—and even finance—employees who are "working against [their] business interest," *Hormel*, 962 F.2d at 1065, either because the conduct isn't flagrantly disloyal or the intent behind it isn't objectively discernible.  If I'm ever in Orlando, I half expect I'd see a commercial along these lines:

> "Hi, I'm Rob Lowe, and I have DirecTV."

> "And I'm 'Channel 6-watching Rob Lowe,' and well, now I have cable."

I just hope my receiver doesn't blow up.