# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 5, 2017         Decided April 13, 2018

No. 16-1278

ONCOR ELECTRIC DELIVERY COMPANY LLC,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS, LOCAL UNION NO. 69,
INTERVENOR

---

Consolidated with 16-1341

---

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

---

*David C. Lonergan* argued the cause for petitioner. With him on the briefs were *Robert T. Dumbacher* and *Amber M. Rogers*.

*David Casserly*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin*, *Jr.*, General Counsel at the time the

brief was filed, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Kira Dellinger Vol*, Supervisory Attorney.

*Hal K. Gillespie* argued the cause and filed the brief for intervenor.

Before: MILLETT and PILLARD, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: The National Labor Relations Act (the "Act") protects the right of employees to "engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Under some circumstances those protected activities include employee appeals to third parties standing "outside the immediate employee-employer relationship." *Eastex, Inc. v NLRB*, 437 U.S. 556, 565 (1978).

But the protection of the Act is no bar to dismissal for "cause," 29 U.S.C. § 160(c) (i.e., a cause independent of protected activity), and, as the Supreme Court said in the case now known generally as *Jefferson Standard*, "There is no more elemental cause for discharge of an employee than disloyalty to [a person's] employer." *NLRB v. Local Union No. 1229, Int'l Board of Elec. Workers*, 346 U.S. 464, 472 (1953). Since then, we have interpreted the practices of the National Labor Relations Board, read in the light of *Jefferson Standard*, to have "formulated a two-prong test for assessing whether employees' third-party appeals constitute protected concerted activity or instead amount to 'such detrimental disloyalty' as to permit the employees' termination for cause." *DirecTV, Inc. v. NLRB*, 837 F.3d 25, 34 (D.C. Cir. 2016). Under the test, even

disparaging statements can enjoy the Act's protection "where [i] the communication indicate[s] it is related to an ongoing dispute between the employees and the employers and [ii] the communication is not so disloyal, reckless or maliciously untrue as to lose the Act's protection," *id*. (citing *American Golf Corp.*, 330 NLRB 1238, 1240 (2000) (*Mountain Shadows Golf*)); see also *Endicott Interconnect Tech., Inc. v. NLRB*, 453 F.3d 532, 537 (D.C. Cir. 2006) (finding that *Mountain Shadows Golf* "accurately reflects the holding in *Jefferson Standard*"). The purpose of the first condition, disclosure to the audience of the disparaging assertions, is of course to enable the recipients to evaluate the statements in a fuller context, applying what the listener or reader regards as a suitable discount or enhancement. *Jefferson Standard*, 346 U.S. at 477; see also *DirecTV*, 837 F.3d at 35 ("[T]hird parties who receive appeals for support in a labor dispute will filter the information critically so long as they are aware it is generated out of that context." (quoting *Sierra Publ'g Co. v. NLRB*, 889 F.2d 210, 217 (9th Cir. 1989)).

Oncor Electric Delivery Company petitions for review of the Board's decision that it engaged in unfair labor practices by discharging its employee, Bobby Reed, for making false or disparaging statements during two minutes of testimony before a Texas senate committee. Oncor argues that the Board misapplied the *Jefferson Standard* test. As the Board's decision essentially skipped discussion of the first requirement for its application, we remand the decision for further consideration.

We "must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Tenneco Auto., Inc. v. NLRB*, 716 F.3d 640, 646–47 (D.C. Cir. 2013) (internal citation and quotation marks omitted). Of course the Board

enjoys no special deference in the interpretations of decisions of the Supreme Court (or, indeed, of other courts).  See *New York New York, LLC v. NLRB*, 313 F.3d 585, 590 (D.C. Cir. 2002).

Even under that deferential standard, we find the Board's reasoning in this case too opaque to resolve whether it is supported by substantial evidence.  We therefore grant the petition in part and remand to the Board to make clear its principles for affording protection to employees' disparaging appeals to third parties; "[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).  Oncor raises other challenges, including its dispute with the Board over Oncor's production of documents and its contention that the Board's General Counsel was without authority to issue the complaint; we reject these arguments. We thus grant the petition in part and deny in part, and we remand to the Board for further clarification.

\* \* \*

The main dispute in this case arises from an October 2012 hearing before a Texas senate committee tasked with "[s]tudy[ing] whether advanced meters, or smart meters, that have been, and will be, installed in Texas have harmful effects on [public] health." Joint Appendix ("J.A.") 443, 444–45.  In 2008 Oncor had begun installing smart meters—essentially digital metering devices that can report customers' electricity usage remotely, thereby eliminating the need for personal inspection and the associated labor costs.  By the time of the legislative committee hearing, Oncor had installed over 3 million smart meters.

Bobby Reed volunteered to testify at a hearing held on October 9. He was an Oncor "trouble man" who completed ad hoc repair jobs and responded to power outages. Since April 2011, he had also been the business manager and financial secretary for the International Brotherhood of Electrical Workers, Local 69. Reed signed the committee's witness list as representing "(Self; IBEW Local 69), Dallas, TX," and indicated he would testify "on" smart meters, rather than "for" or "against." J.A. 451. He was allotted two minutes.

During his brief testimony, Reed said he represented the local union in Dallas and had consulted its equivalent in Houston. He testified that "the work orders that I went out on were beginning to be increasingly of the meters burning up and burning up the meter bases." J.A. 14. Reed reiterated that this occurrence was becoming more frequent, and had begun "when they started installing the AMS [Advanced Metering System, or smart] meters." *Id.* When asked by a senator whether the burning could be attributed to the power line, Reed was emphatic, "No, it's the meter." *Id.* Reed made two arguable references to working conditions. First, he testified to receiving repair orders or damaged boxes after the meters had burned. There was no mention of employees' encountering fires, electrical arcs, or other live hazards while servicing the meters. Second, his testimony focused on his experience with disgruntled customers. He spoke of an "elderly woman," a widow, who had been told by Oncor that she would have to pay for the damage herself before her power could be turned back on. *Id.* Reed concluded that he did not "know much about [radio] frequency [a topic raised earlier in the hearing], but I do know a little bit about fire and heat, and these things are causing damage to people's homes." *Id.*

The day after Reed's testimony, Oncor initiated an investigation to verify whether the company had received complaints of smart meters causing fires and damaging

consumers' homes. Concluding that Reed's testimony was false, Oncor terminated his employment on January 14, 2013, for Reed's having given "false testimony." J.A. 1555. After a seven-day trial, an administrative law judge held that the discharge violated § 8(a)(3) and (1) of the Act for interfering with Reed's protected union activities. The Board affirmed.

\* \* \*

We first clear out of the way an Oncor argument that Reed's testimony was not "for the purpose of collective bargaining or other mutual aid or protection," a fundamental prerequisite of protection under § 7 of the Act. Reed informed Oncor that he would testify to the senate committee if the union did not reach a favorable result in the collective bargaining then going on between the union and Oncor. Reed then testified the next day and signified both on the witness list and in his remarks that his testimony was on behalf of the union. We will return to the collective bargaining shortly, as it plays a role in the Board's contention that Reed's message to the committee qualified for protection under *Jefferson Standard*. But basic qualification for protection under § 7 and satisfying the conditions for protection under *Jefferson Standard* are two separate issues. See *Tradesmen Int'l, Inc. v. NLRB*, 275 F.3d 1137 (D.C. Cir. 2002). The Board properly found the former met here; we now turn to the latter.

Oncor argues that the Board never addressed the first requirement of *Jefferson Standard*—that an employee's appeal to a third-party "indicate it is related to an ongoing dispute between the employees and the employers." *Mountain Shadows Golf*, 330 NLRB at 1240. The Board tacitly (and, given the record, necessarily) admits that it didn't address this point but argues that Oncor never raised the objection to the Board, thus barring our review under § 10(e) of the Act, 29 U.S.C. § 160(e). It points out that Oncor nowhere cited

*Jefferson Standard* or *Mountain Shadows Golf* in its exceptions to the Board.

We are satisfied that Oncor did in fact raise this objection. In the context of its exceptions to the ALJ's finding of protected activity, Oncor objected that "[t]he General Counsel did not present any evidence that Reed testified to publicize a labor dispute." J.A. 78–79. The point was clear enough to the General Counsel, who responded to the exception by citing *Jefferson Standard* and arguing that the test could be met "when it is clear from the context that [third-party appeals] are related to a labor dispute and/or employees' terms and conditions of employment." J.A. 132. To apply the § 10(e) bar on the ground of Oncor's failure to cite *Jefferson Standard* itself would represent a clear, and offensive, "triumph of technical pleading over fundamental fairness." *NLRB v. Blake Constr. Co.*, 663 F.2d 272, 284 (D.C. Cir. 1981).

\* \* \*

Evidently recognizing that the § 10(e) defense was not impregnable, the Board's brief offered a theory as to why Reed's testimony gave an adequate indication of its connection to a labor dispute. Further, in addressing the issue of whether Reed's testimony enjoyed the protection of § 7 *regardless* of its expressing disparagement to third parties, the Board offered two reasons that it may on remand view as relevant to what we may call the "indication" question. Because at least one of those reasons—reliance on an undisclosed attempt to gain leverage in bargaining—rests on a legal error, we comment on the Board's reasoning as guidance for the remand.

There is a serious obscurity underlying the question of adequate notice of the link between statement and labor dispute. Neither the Board's practice—nor court precedents— make clear who has the burden of proof on the two conditions

for employee protection under *Jefferson Standard*. At argument, counsel for the Board invited us to think of *Jefferson Standard* as a sort of defense for employers to raise against a finding that they were unlawfully sanctioning protected activities.

It is true that some cases, not in this circuit, speak of employees' appeals to third parties as being "stripped of § 7 protection" under the doctrine, perhaps implying that failing the *Jefferson Standard* test causes a labor activity to *lose* its protected status and thus that the doctrine operates as an employer's defense. *Misericordia Hosp. Med. Ctr. v. NLRB*, 623 F.2d 808, 815 (2d Cir. 1980). Our circuit's cases have not explicitly addressed whether the Board's General Counsel bears the burden to show that a third-party appeal has "indicated" its connection to an ongoing labor controversy, or whether the absence of any such indication serves as a defense for the employer where an appeal to third parties would otherwise be protected under § 7. In some cases, though, the phrasing of the issue arguably suggests that parties seeking protection for disparagements need to show the connection to an ongoing labor controversy in order to *gain* the Act's protection. Cf., e.g., *DirecTV*, 837 F.3d at 35 ("And because a third-party appeal must *indicate* a connection to an ongoing labor dispute in order to satisfy the first step (mere contemporaneousness with a dispute is not enough), the handbill in *Jefferson Standard* would have been deemed unprotected even if the Board had found otherwise.") (internal citation omitted); *George A. Hormel & Co. v. NLRB*, 962 F.2d 1061, 1064 (D.C. Cir. 1992) ("[S]upporting a boycott [of an employer's products] is protected § 7 activity if it (1) is related to an ongoing labor dispute . . . ."); *Endicott*, 453 F.3d at 538 (Henderson, J., concurring). *Jefferson Standard* itself used both formulations. First, the Court found that a disparaging handbill that did not identify its union authorship or connection to an ongoing strike "bring[s] the [authors and distributors']

discharge under § 10(c) [for cause]"; that is, their activities did not count as protected in the first place. 346 U.S. at 477. Alternatively, the Court found that even if the handbill distribution came under § 7's protected activities, "the means used by the technicians in conducting the attack have deprived the attackers of the protection of that section." *Id*. at 477–78.

One possibility of course would be for the Board's General Counsel to bear the burden of step one—showing substantial evidence that a third-party appeal adequately indicated its connection to an ongoing labor dispute—while the employer would then bear the burden of step two—affirmatively defending that the third-party appeal was so disloyal as to lose the protection initially gained at step one. But the issue is in the first instance for the Board. Since neither the ALJ nor the Board addressed the first step of *Jefferson Standard* at all, and since we have found that Oncor adequately raised the objection under § 10(e), we must remand to the Board; "the courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review." *Chenery*, 318 U.S. at 94. The Board's explanation of its view on whether the *Jefferson Standard* test is satisfied will almost certainly require it to take a position on the allocation of burdens.

On the substantive merits, the Board's brief rests on a years-long dispute between Oncor and the union over the deployment of smart meters and the union's previous lobbying of the Texas legislature for a bill that would allow customers to opt out of smart meters. The Board suggests that in this context, plus Reed's identifying himself with the union and his testifying about smart meters, "the legislators would recognize that the Union and Oncor were engaged in a labor dispute regarding smart-meter deployment, and that Reed was at the hearing to represent the Union's side of that dispute." Respondent's Br. 43.

The record gives very little indication of significant union lobbying on smart meters in the years before Reed's testimony. See J.A. 374–83 (documenting union lobbying from 2002 to 2005); 2116–17 (Reed's testimony to the Board that the union hoped to gain an opt-out bill on smart meters from the 2012 Texas senate committee). Reed had e-mailed legislative staff about smart meters in April 2011, but that e-mail was sent to a different committee from the one he testified before, in regard to a bill that was no longer pending when he testified (and the e-mail itself contained no overt nexus to employee interests). J.A. 384. While we recognize that Reed could be expected to offer only so many caveats in his two-minute testimony, and while a legislative audience may be especially sophisticated at spotting embedded special interest claims, Reed did not sign up to speak "for" or "against" smart meters, but "on" the topic. J.A. 451. It seems clear enough that the union opposed smart meters largely because automation threatened a decline in the workforce, but that was not a topic of Reed's testimony. If on remand it appears that the union's longstanding concern over smart meters' effect on employment is the only relevant "labor dispute," we seriously question Board counsel's implicit assumption that employee disparagement of *any feature* of an innovation is an adequate signal to listeners that the speaker's position is driven by workers' anxiety about the innovation's possible job-killing effects (and thus possibly subject to some discount). See, e.g., *MikLin Enter., Inc. v. NLRB*, 861 F.3d 812, 822–23 (8th Cir. 2017) (finding that *Jefferson Standard* requires disparagement to be "part of or directly related to an ongoing labor dispute" to be protected). Of course it is for the Board to determine, on remand, what other indication—if any—the audience had of a connection between Reed's testimony and an ongoing labor dispute.

In its opinion the Board's first reason for finding Reed's testimony protected under § 7 was Reed's previously announced (to his employer) intention to use the testimony to

gain leverage in ongoing collective bargaining negotiations with Oncor over wage issues and a contract extension. Only the day before his testimony, Reed had met with Oncor officials in his capacity as a union representative to renegotiate the collective-bargaining agreement, which was set to expire later in the month. At a preliminary meeting, Reed announced, "I'm trying to play nice in the sandbox, we're here to make a deal today, if we can't, I'm going to be in Austin testifying before the Senate commerce committee tomorrow about smart meters." J.A. 13. The parties agree that negotiations stalled over the term of the CBA's extension. Oncor offered only a one-year extension, in part, the ALJ found, because of uncertainty over how the legislature would respond to smart meters.

The strikers in *Jefferson Standard* had a similar intent to "gain leverage" in negotiations. Their handbill, however, "made no reference to the union, to a labor controversy or to collective bargaining," and the Supreme Court found that "[t]he only connection between the handbill and the labor controversy was an ultimate and undisclosed purpose or motive on the part of some of the sponsors that, by the hoped-for financial pressure, the attack might extract from the company some future concession." *Id*. at 476–77. "A disclosure of that motive might have lost more public support for the employees than it would have gained, for it would have given the handbill more the character of coercion than of collective bargaining." *Id*. at 477. The Supreme Court thus held in *Jefferson Standard* that a "sharp, public, disparaging attack upon the quality of the company's product," 346 U.S. at 471, does not qualify as a protected § 7 collective bargaining activity when the subject matter "ha[s] no discernible relation to [the labor] controversy" and the motive to gain raw leverage in bargaining with the employer was "undisclosed" to third parties, *id*. at 476–77; see *DirecTV*, 837 F.3d at 35.

By the same token, there is no finding by the Board in this case either that Reed disclosed his subjective motive to pressure Oncor into concessions during labor negotiations or that the subject matter of Reed's statements was "connect[ed] to [the] ongoing labor dispute." *DirecTV*, 837 F.3d at 35. In the absence of any such findings, the mere "fortuity of the coexistence of a labor dispute" and third-party product disparagements does not satisfy the *Jefferson Standard* requirement that Reed's testimony indicate a nexus to an ongoing labor dispute. See *DirecTV*, 837 F.3d at 35; see also *Jefferson Standard*, 346 U.S. at 477 (no protection where product disparagement was "a concerted separable attack purporting to be made in the interest of the public rather than in that of the employees"). Whereas disparagements linked to a specific issue in a labor dispute, e.g., a complaint about how a product flaw aggravates customers, whom the workers must constantly face, are likely to engage listeners because a win for the workers will imply a win for customers, disparagements not so linked seem unlikely to enlist listener support—at least *if* they reveal the speakers' true purpose. It would be strange to tempt unions to sail so close to the wind by protecting statements that only marginally reveal a speaker's motivation.

Finally, the Board found Reed's testimony protected (aside from the *Jefferson Standard* difficulty) because it "related to (and was spurred by)" a union concern about the "safety" of employees represented by the union. J.A. 3. The Board asserted "Reed's perception of a fire or electrical-arcing hazard to himself and his coworkers," *id*. at 4, but in fact the testimony makes no mention of worker hazards. In its opinion, the Board pivoted from the worker-hazard assertion to a claim that "Reed illustrated the effect on employees' working conditions of the increase both in the number of service calls and the frequency with which they had to deal with disgruntled customers when explaining to them that they must pay to repair or replace their burned up meter bases." J.A. 3–4.

There is a lot to tease out here, and the Board has given us no help on how to do it. First, as we said, the testimony made no detectible reference to worker risks. Second, the Board has done nothing to spell out the conditions under which a reference to an employer practice that may generate "disgruntled" consumers could "indicate" a link to a labor dispute. In *Jefferson Standard*, the handbills in question attacked the employer, a local television station, for undue reliance on old programs and a complete absence of local programming. In context, this was no suggestion of a link to a labor dispute, because the labor dispute didn't revolve around those deficiencies. See 346 U.S. at 468. Similarly, here; so far as the collective bargaining was concerned, smart meters were not an issue (except as a partial explanation for the parties' differing preferences as to contract duration). If the Board is to rely on the *deep background* dispute over smart meters, it will have to draw some intelligible lines as to when statements that look like simple disparagement can be found, without more, to signal to the audience that the remarks are a move in a genuine labor dispute.

The Second Circuit has held that a workers' report about a hospital's quality of care (including understaffing), submitted to a special commission on hospital accreditation, qualified for protection notwithstanding *Jefferson Standard*. *Misericordia*, 623 F.2d at 813–15. Because of the commission's role in enforcing state and federal health care standards, the court found that the Board "was correct in concluding that the Report was similar to protected complaints made to an appropriate administrative agency." *Id*. at 813. Perhaps because of that analogy, the court made no effort to consider expressly the extent to which the report gave its readers any indication of relating to a labor dispute. We note that *Misericordia* was decided long before the Board enunciated its two-pronged approach to *Jefferson Standard* in *Mountain Shadows Golf*.

We vacate and remand to the Board to make clear: the burden of proof on *Jefferson Standard*'s first condition for protection of a disparaging statement, its conclusion on the merits of that issue, and of course its grounds for both conclusions.

\* \* \*

Remand would be unnecessary if there were no substantial evidence to sustain the Board's view under *Jefferson Standard*'s second requirement for protection of an employee's disparagement to third parties, namely a finding that his testimony was not "maliciously untrue," J.A. 5 (quoting *Valley Hospital Medical Center*, 351 NLRB 1250, 1252 (2007)). Oncor argues that it was. We disagree and affirm the Board's findings on this issue.

While the ALJ noted that Reed's two-minute testimony was arguably "imprecise, even careless," the Board found that Reed's statements did not rise to the level of malicious falsehood. J.A. 24. We agree that his testimony certainly lacked restraint. By concluding that "I do know a little bit about fire and heat, and these [smart meters] are causing damage to people's homes," J.A. 14, Reed gave the impression that smart meters (and only smart meters, not their analog counterparts) were causing actual fires capable of significant structural damage. In reality, it appears that the problem, to the extent there was one, consisted of newer meters not quite fitting correctly into older meter bases, with the result that meters sometimes sparked, arced, and caused lug nuts or portions of the meter base to melt or burn. Oncor contends this problem could arise in any new meter, whether analog or digital.

But Reed was technically right that the heat was damaging customer's "homes" because meter bases, unlike the meters themselves, are the property of customers and thus their

responsibility to repair and replace. Reed's opening testimony made clear he was addressing smart meters' tendency to "burn[] up the meter bases." J.A. 14. Before his testimony he consulted the local union in Houston and a Dallas County assistant fire marshal and received some confirmation of his perception that smart meters were overheating more frequently. Oncor protests that the smart meters in Houston were of an entirely different type than those used in Dallas and that a careful review of Reed's work orders does not bear out his intuition that smart meters were any more problematic than analog meters. But because Reed's possible malice is an arguable question of fact, we defer to the Board's weighing of the evidence. On this record, there is substantial evidence to sustain the Board's decision. See *DirecTV*, 837 F.3d at 42 (according "considerable deference" to the Board's reasonable conclusions on malicious intent).

\* \* \*

In addition to finding Oncor liable under § 8(a)(3) for interfering with Reed's protected Union activities, the Board held Oncor had also violated § 8(a)(5) for failing to produce needed information to bargaining representatives. See 29 U.S.C. § 158(a)(5). Oncor objects to the three separate findings of fault on its part, but we find no error in the Board's rulings.

Oncor does not dispute the relevance of the first two requests for information. On December 18, 2012, the Union requested "[a]ll documents *reviewed* and/or created *or considered* in connection with [Oncor's] investigation" of the veracity of Reed's testimony. J.A. 1548–51 (emphasis added). Oncor contends that after searching its records it found no help-line records, service orders, lawsuits or claims reporting burning smart meters. The ALJ found Oncor in violation because it did not produce the records and orders it had "reviewed or considered" so that the Union could make its own

determination of whether they related to burned smart meters. As the ALJ noted, Oncor never raised an objection as to why it should not produce those records in their entirety.

On March 25, 2013, the Union requested information "pertaining directly to [Reed's] discharge, possible disparate treatment, and/or records that might substantiate the testimony he gave." J.A. 1560. Oncor objects that because the grievance was going to arbitration, the request for information amounted to pre-arbitration discovery to which the Union was not entitled. The ALJ reasoned that although "there is no right to pretrial discovery when a grievance has been referred to arbitration," J.A. 21 (citing *California Nurses Ass'n*, 326 NLRB 1362 (1998)), and parties are not permitted to seek information on their opponents' arbitral strategy, see *id*., employers remain under the obligation to produce relevant information as timely requested by bargaining representatives. The ALJ sanctioned Oncor for failing to meet the latter burden.

Finally, in a case virtually unrelated to this one (but involving some of the same cast of characters), the Union sought information from Oncor regarding the termination of an employee, Samuel Goodson, and the promotion of a comparator employee, Eddie Lopez. Oncor refused to provide Lopez's personnel file for the period after Lopez's promotion, arguing it was irrelevant once Lopez was no longer a member of the same unit as Goodson. The Board overruled the ALJ to sanction Oncor for its refusal. The incident for which Goodson was fired occurred on May 13, 2013. Lopez was promoted on May 26, while Goodson was disciplined on July 16. The Union requested both employees' files on July 25. The Board concluded that the relevance of Lopez's file as a comparator to Goodson's should have been obvious to Oncor even after Lopez's promotion.

While producible information "must be relevant, the threshold for relevance is low." *DaimlerChrysler Corp. v. NLRB*, 288 F.3d 434, 443 (D.C. Cir. 2002) (internal citation and quotation marks omitted). "The Supreme Court has described the relevance standard as a liberal, 'discovery-type' standard." *Id.* (quoting *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 437 (1967)). And the issue of relevance "is, in the first instance, a matter for the NLRB, and the Board's conclusions are given great weight by the courts." *Oil, Chem. & Atonic Workers v. NLRB*, 711 F.2d 348, 360 (D.C. Cir. 1983). Under this deferential standard, we do not find that the Board was unreasonable in its decision to sanction Oncor's failure to produce Union-requested information.

* * *

As a final ambitious alternative, Oncor asks that we dismiss the General Counsel's complaint because he did not have authority to issue it. The Supreme Court recently ruled that the official who initiated the complaint against Oncor, Acting General Counsel Lafe Solomon, served in violation of the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345 et seq. ("FVRA"). *NLRB v. SW General, Inc.*, 137 S. Ct. 929 (2017). Shortly after our court had reached the same conclusion in the case affirmed by the Supreme Court, *SW General, Inc. v. NLRB*, 796 F.3d 67, 83 (D.C. Cir. 2015), the duly appointed General Counsel Richard F. Griffin Jr. sent Oncor a notice of ratification, which indicated that he had reviewed the record and independently decided to pursue the complaint. J.A. 169. We need not decide on the effectiveness of the ratification, however, because we find our review blocked by the untimeliness of Oncor's objection, raised in the form of a motion filed with the Board about 18 months after it had already filed its exceptions to the ALJ's decision and after General Counsel Griffen's notice of ratification apparently gave Oncor the idea. In *SW General*, after reviewing the trade-

offs inherent in applications of the de facto officer doctrine (between the needs for providing adequate remedies for actions taken invalidly and for enabling the executive branch to undertake prompt cures, see also *Andrade v. Lauer*, 729 F.2d 1475, 1499 (D.C. Cir. 1984)), we found the exception there timely, observing, "We address the FVRA objection in this case because the petitioner raised the issue in its exceptions to the ALJ decision," but we "doubt[ed] that an employer that failed to timely raise an FVRA objection—regardless whether enforcement proceedings are ongoing or concluded—will enjoy the same success." *SW General*, 796 F.3d at 83. In view of the delay here, we find the claim barred.

\* \* \*

Oncor's petition is granted in part and denied in part. The Board's decision is vacated and remanded for further proceedings, specifically to clarify the burdens of proof in cases under *Jefferson Standard* and articulate whether and how those burdens were met here. The Board's cross-petition for enforcement is accordingly denied in part. Its petition to enforce its order on the requests for information is granted.

*So ordered.*