# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 12, 2025         Decided April 28, 2026

No. 24-1277

ONCOR ELECTRIC DELIVERY COMPANY LLC,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
LOCAL UNION NO. 69,
INTERVENOR

———

Consolidated with 24-1281

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*Amber M. Rogers* argued the cause for petitioner/cross-respondent. With her on the briefs was *David C. Lonergan*.

*Barbara A. Sheehy*, Attorney, National Labor Relations Board, argued the cause for respondent/cross-petitioner. On the brief were *William B. Cowen*, Acting General Counsel, *Ruth E. Burdick*, Deputy Associate General Counsel, *Meredith Jason*, Assistant General Counsel, *Elizabeth A. Heaney*, Supervisory Attorney, and *Kellie Isbell*, Senior Attorney.

*Hal K. Gillespie* argued the cause and filed the brief for intervenor in support of respondent.

Before: SRINIVASAN, *Chief Judge*, MILLETT and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: This case is about the balance between an employee's right to speak out about matters connected to an ongoing labor dispute and an employer's right to terminate employees who make disparaging public comments. *See NLRB v. Loc. Union No. 1229, Int'l Bhd. of Elec. Workers*, 346 U.S. 464, 471–73 (1953) ("*Jefferson Standard*"). Oncor Electric Delivery Company LLC terminated Bobby Reed after he gave disparaging testimony about Oncor's products at a legislative hearing. The National Labor Relations Board found that Reed's testimony was protected and that Oncor committed unfair labor practices. Because the Board misapplied the relevant standard and its conclusions are unsupported by substantial evidence, we grant Oncor's petition for review and deny the Board's cross-petition for enforcement.

## I.

This is Oncor's second petition for review arising from Reed's termination, and we draw on the facts as recounted in

our previous opinion. *See Oncor Elec. Delivery Co. LLC v. NLRB*, 887 F.3d 488, 493–94, 496–97 (D.C. Cir. 2018) ("*Oncor I*"). Oncor is a Texas electric utility company. In 2008, Oncor began rolling out digital metering devices. The new smart meters monitored customers' electrical usage remotely, eliminating the need for manual meter readings by utility technicians. This led to layoffs, raising concerns among unions representing utility workers. The smart meter rollout also received pushback from customers. In response to concerns about potential health impacts from the meters' radio frequencies, the Texas Senate Business and Commerce Committee held a hearing in October 2012 to address smart meters' effects on health.

Among those who testified at the hearing was Oncor employee Bobby Reed. Reed was a "trouble man," a technician who responds to power outages. He was also the chief spokesperson for the International Brotherhood of Electrical Workers, Local Union Number 69 (the "Union") in negotiations with Oncor to extend a collective bargaining agreement. The first negotiating session took place the day before the senate hearing. Reed told Oncor's representatives that if they could not make a deal, he would testify about smart meters at the hearing.

Oncor and the Union did not reach a deal, and Reed testified the next day. On the witness list, he stated he was representing "Self; IBEW Local 69." While other witnesses identified as "for" or "against" smart meters, Reed signed up to testify "on" smart meters. Reed began his two-minute testimony by identifying himself as an Oncor trouble man and union representative. He stated that after the rollout of smart meters, he noticed his work orders "were beginning to be increasingly of the meters burning up and burning up the meter bases." Reed described an interaction with one woman who

came out of her house as Reed was working on her meter. Reed testified that when he explained the meter base had "burnt up," she said she "never had a problem" until the new meter was installed. When a legislator interrupted Reed to ask if the issue was really the new meters and not old lines, Reed affirmed the meters were the problem and that a union representative in Houston had also observed similar issues. Reed concluded by stating the meters were "causing damage to people's homes."

Oncor management learned of Reed's testimony and discharged him for violating a company policy against providing misleading or fraudulent information to public officials.

An administrative law judge ("ALJ") found Reed's testimony protected under section 7 of the National Labor Relations Act ("NLRA"), which protects employees' right "to engage in … concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The ALJ concluded that Oncor violated NLRA sections 8(a)(1) and (3). Section 8(a)(3) makes it an unfair labor practice to "discriminat[e] in regard to hire or tenure of employment … to encourage or discourage membership in any labor organization." *Id.* § 158(a)(3). A violation of section 8(a)(3) is necessarily a violation of section 8(a)(1), which prohibits interference with the rights guaranteed by section 7. *Id.* § 158(a)(1). The Board adopted the ALJ's conclusion that Oncor violated sections 8(a)(1) and (3) and ordered Oncor to offer Reed reinstatement and to make him whole "for any loss of earnings and other benefits" due to his termination. *Oncor Elec. Delivery Co., LLC*, 364 NLRB 677, 682 (2016).

Oncor petitioned for review. We granted the petition in part. We agreed with the Board that Reed's testimony was "'for the purpose of collective bargaining or other mutual aid or

protection,' a fundamental prerequisite of protection under [section] 7." *Oncor I*, 887 F.3d at 494 (quoting 29 U.S.C. § 157). But we determined the Board failed to correctly apply the *Jefferson Standard* test. Under that test, an employee may be discharged for making a disparaging comment to a third party if the communication (1) does not disclose that "it is related to an ongoing dispute between the employees and the employers" or (2) is "so disloyal, reckless or maliciously untrue as to lose the [NLRA's] protection." *DirecTV, Inc. v. NLRB*, 837 F.3d 25, 34 (D.C. Cir. 2016) (cleaned up); *see Jefferson Standard*, 346 U.S. at 471–72, 476–78. We held substantial evidence supported the Board's finding that Reed's remarks were not "maliciously untrue" under the second prong. *Oncor I*, 887 F.3d at 498–99. But because the Board failed to address the first prong, we remanded "for further consideration" of that issue.[1] *Id.* at 493. On remand, a divided three member panel of the Board found that Reed's testimony showed a connection to an ongoing labor dispute and concluded that his termination was unlawful. *See Oncor Elec. Delivery Co., LLC*, 373 NLRB No. 80, slip op. at 3–7 (July 26, 2024).

Oncor again petitioned for review, and the Board cross-petitioned for enforcement. The Union intervened to defend the Board's decision. We have jurisdiction over the petitions under 29 U.S.C. § 160(e) and (f).

---

[1] We also instructed the Board to clarify who bears the burden of proof for whether a communication indicates it is related to an ongoing labor dispute. *Oncor I*, 887 F.3d at 498. The Board confirmed on remand that the burden is on the NLRB General Counsel.

6

II.

"Judicial review ensures that the Board stays within statutory and constitutional limits." *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 475 (D.C. Cir. 2020). We must vacate the Board's decision if it is "arbitrary, capricious, or grounded in legal error," or if substantial evidence does not support the Board's findings of fact. *Longmont United Hosp. v. NLRB*, 70 F.4th 573, 578 (D.C. Cir. 2023) (cleaned up). It is legal error for the Board to misapply judicial precedent interpreting the NLRA. *Cf. Oncor I*, 887 F.3d at 493 ("Of course the Board enjoys no special deference in the interpretations of decisions of the Supreme Court (or, indeed, of other courts).").

III.

We hold that Reed's disparaging statements to the senate committee are not protected speech under the NLRA because he did not mention, much less draw a clear connection to, an ongoing labor dispute. The Board misapplied *Jefferson Standard*, and its findings are not supported by substantial evidence.

A.

NLRA section 7 protects employees' right "to engage in … concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. This includes a right to appeal to third parties outside the employment relationship in an effort to "improve terms and conditions of employment." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978). At the same time, section 10(c) recognizes that employers may lawfully dismiss employees "for cause." 29 U.S.C. § 160(c). For-cause dismissal includes dismissal for

speech that disparages the employer. *Jefferson Standard*, 346 U.S. at 476–78.

The *Jefferson Standard* test attempts to balance employees' right to appeal to third parties for support in labor disputes with employers' right to discharge employees for making disparaging statements. In *Jefferson Standard*, the Supreme Court held that employees were lawfully discharged for "detrimental disloyalty" when they distributed handbills that attacked their employer but did not disclose that the employees were attempting to gain leverage in collective bargaining negotiations. *Id.* at 472, 476–77. For a disparaging communication to receive NLRA protection, the employee must disclose that it is being made in connection to an ongoing labor dispute. *DirecTV*, 837 F.3d at 34. This enables the listener to "apply[] … a suitable discount or enhancement" in evaluating the communication. *Oncor I*, 887 F.3d at 492. In other words, because section 7 protects an employee's disparaging statements only when they are part of an appeal for support in an ongoing labor dispute, the employee's appeal must link the comments to such a dispute. *See Jefferson Standard*, 346 U.S. at 476 (explaining the unprotected "attack asked for no public sympathy or support" and "related itself to no labor practice of the company").

## B.

At the hearing, Reed said nothing to connect his concerns and criticisms about Oncor's smart meters to an ongoing labor dispute, and therefore section 7 of the NLRA does not protect him from dismissal based on the disparaging nature of his remarks.

8

1.

In its first decision, the Board ignored the first step of the *Jefferson Standard* test, and on remand, the Board misapplied the test. There is no dispute that Reed's two-minute testimony did not explicitly refer to a labor dispute. At the hearing, Reed introduced himself as an Oncor trouble man and union representative, stated he had encountered burned meter bases when responding to work orders, and attributed the burnings to smart meters. He did not discuss the stalled negotiations about extending the Union's collective bargaining agreement. Nor did he mention any other ongoing dispute between the Union and Oncor, much less connect such a dispute to the problems with smart meters. In short, nothing in Reed's testimony disclosed it was "a move in a genuine labor dispute." *Oncor I*, 887 F.3d at 498.

Reed's remarks suffer from a similar defect as the unprotected speech in *Jefferson Standard.* In that case, the employees worked at a television station and were in the midst of gridlocked collective bargaining negotiations. *Jefferson Standard*, 346 U.S. at 467. The employees distributed handbills attacking the quality of the station's programming. *Id.* at 468. The Supreme Court explained that in disparaging the station's programming, the employees did not disclose any labor-related motive, instead they "purported to speak as experts, in the interest of consumers and the public at large." *Id.* at 472. Like the station employees, Reed purported to speak in the public interest: he testified as an experienced trouble man about meter bases burning up and asserted that smart meters were the cause. He did not disclose an ongoing labor dispute nor did he connect his claims about smart meters to any labor dispute.

Oncor did not violate the NLRA by discharging Reed for his testimony because nothing in that testimony communicated a connection to a labor dispute between the Union and Oncor.

2.

The Board nevertheless contends that *Jefferson Standard*'s first prong is satisfied because the senate committee would have realized from the "full context" that the Union and Oncor were in a labor dispute about smart meters and because Reed made negative references to his working conditions. *Oncor*, 373 NLRB No. 80, slip op. at 4. First, the Board found that as legislators, senate committee members would expect to be lobbied. Second, the Board presumed the committee would have background knowledge about a conflict between Oncor and the Union because the Union had previously lobbied for a consumer opt-out from the smart meter rollout, and because the Houston union had also observed meters burning up. Finally, the Board emphasized that because Reed identified himself as a representative of the Union, his listeners would understand that his comments were "in the context of employer-employee and union-employer relationships." *Id.* at 6.

The Board's general assumptions about lobbying and the knowledge of Texas lawmakers are attenuated from any specific labor dispute between Oncor and the Union and therefore cannot satisfy *Jefferson Standard*'s first prong. That the committee members would expect lobbying or could have known about other labor concerns related to smart meters is not germane to whether Reed's statements disclosed a connection to an ongoing labor dispute. Even if the audience might have known of some other conflict between Oncor and the Union, the "mere fortuity of the coexistence of a labor dispute and third-party product disparagements" is not enough. *Oncor I*, 887 F.3d at 497 (cleaned up); *see also DirecTV*, 837 F.3d at 35

("[A] third-party appeal must *indicate* a connection to an ongoing labor dispute in order to satisfy the first step (mere contemporaneousness with a dispute is not itself enough).").

The Board also overstates the significance of Reed's self-identification as a union representative. He first identified himself as representing "Self," and only second as a member of "IBEW Local 69." And we previously expressed skepticism that Reed's union membership would have signaled he was testifying on the Union's side in a labor dispute over smart meters, especially given that he signed up to testify "on" rather than "against" smart meters. *See Oncor I*, 887 F.3d at 496. Reed's identification with the Union revealed nothing about his intent to pressure Oncor into concessions during ongoing labor negotiations because those negotiations were never mentioned.

The mismatch between Reed's testimony and any labor dispute further demonstrates why the first *Jefferson Standard* prong is not met here. To the extent there was a dispute between Oncor and the Union about smart meters, it was about smart meters' effect on the demand for labor. As we previously recognized, this "was not a topic of Reed's testimony." *Id.* And we "seriously question[ed]" the assumption "that employee disparagement of *any feature* of an innovation is an adequate signal to listeners that the speaker's position is driven by workers' anxiety about the innovation's possible job-killing effects." *Id.* Nor does the record suggest the labor negotiations in which Reed was trying to gain leverage pertained to smart meters' safety risks. *See id.* at 498 ("[S]o far as the collective bargaining was concerned, smart meters were not an issue (except as a partial explanation for the parties' differing preferences as to contract duration)."). Disregarding the deficiencies identified in *Oncor I*, the Board erred by relying on the general context in which Reed testified to conclude his statements indicated a connection to an ongoing labor dispute.

Conceding that "Reed's testimony did not indicate any active concerns about the 'job-killing effects' of smart meters," the Board insists his remarks nonetheless "conveyed other negative impacts of smart meters on terms and conditions of employment." *Oncor*, 373 NLRB No. 80, slip op. at 5 n.10. According to the Board, Reed's testimony satisfied the first prong because it "clearly conveyed how smart meters negatively impacted his terms and conditions of employment" by discussing increased work orders and interactions with disgruntled customers. *Id.* at 5–6.

We disagree. An employee's negative statements about working conditions, without more, do not show that those conditions are part of a labor dispute. The Board's suggestion that any disparaging communication that references working conditions satisfies *Jefferson Standard*'s first prong would eviscerate the requirement that the protected communication express a connection to an ongoing employer-employee dispute.

As we have explained, disparaging statements are only protected insofar as they are part of an appeal for support in a labor dispute. The fact that an employee's criticism of his employer references working conditions does not necessarily connect that criticism with such an appeal. In *Oncor I*, we faulted the Board for having "done nothing to spell out the conditions under which a reference to an employer practice that may generate 'disgruntled' customers could 'indicate' a link to a labor dispute." 887 F.3d at 498. The Board again failed to articulate this necessary connection.

The Board's working conditions rationale runs into another fatal difficulty: substantial evidence does not support the Board's finding that Reed testified about smart meters' negative effects on his conditions of employment. The Board

takes Reed's anecdote about the woman whose meter burned as a claim that smart meters were forcing technicians to deal with disgruntled customers. But as Member Kaplan pointed out in dissent, this "did not indicate that there had been any increase in disgruntled customers on the job, or that the customers were more disgruntled than usual." *Oncor*, 373 NLRB No. 80, slip op. at 12 n.5 (Kaplan, dissenting in part). And if smart meters were increasing the overall number of service calls, that effect would not necessarily be negative. The Union's main concern with smart meters was, after all, reduced demand for in-person labor.[2] The Board erred both by assuming that an employee's discussion of working conditions necessarily indicates a connection to an ongoing labor dispute and by finding that Reed's testimony was a complaint about his working conditions.[3]

---

[2] The Board suggests on appeal that Reed's statements also referenced working conditions by alluding to safety risks to workers from handling burning meters. But as the Board's counsel conceded at oral argument, that contention is barred by the law of the case. Oral Arg. Tr. 29:2–11; *Oncor I*, 887 F.3d at 498 ("[T]he testimony made no detectible reference to worker risks."). Under the law of the case doctrine, we are "loathe to reconsider issues already decided in the absence of extraordinary circumstances." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) (cleaned up).

[3] Oncor also argues the Board lacks statutory authority to order relief resembling compensatory damages. The Board's remedial authority is limited to issuing cease and desist orders and ordering "such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies" of the NLRA. 29 U.S.C. § 160(c). Several of our sister circuits have held that the Board exceeds its authority when it orders compensation for "foreseeable pecuniary harms" (so-called "*Thryv*" remedies"). *See NLRB v. Starbucks Corp.*, 159 F.4th 455, 470–71 (6th Cir. 2025); *Hiran Mgmt., Inc. v. NLRB*, 157 F.4th 719, 728–29 (5th Cir. 2025);

13

*  *  *

The Board incorrectly determined that Reed's testimony was protected activity where nothing in his remarks communicated a connection to an ongoing labor dispute. We will not "tempt unions to sail so close to the wind" by protecting disparaging statements that do not indicate such a connection. *Oncor I*, 887 F.3d at 497. Because Reed was discharged for cause rather than for protected speech, his discharge was not an unfair labor practice. We accordingly grant Oncor's petition for review and deny the Board's cross-petition for enforcement.

*So ordered.*

---

*NLRB v. Starbucks Corp.*, 125 F.4th 78, 95–96 (3d Cir. 2024). *But see Int'l Union of Operating Eng'rs, Stationary Eng'rs, Loc. 39 v. NLRB*, 155 F.4th 1023, 1052–53 (9th Cir. 2025) (upholding the Board's authority to order compensation for foreseeable pecuniary harms so long as such compensation is limited to making employees whole). Because we vacate the Board's decision on the ground that Oncor did not commit an unfair labor practice, we do not address this remedial question.